IN THE MATTER OF SHARON J. PATE.—S. W. (2d)—.

Springfield Court of Appeals. July 20, 1938.

*E. W. Jones* for informants.

*Von Mayes* and *Corbett & Peal* for respondent.

ALLEN, P. J.—This is an original proceeding in disbarment against Sharon J. Pate, a licensed attorney of this State. Honorable M. E. Montgomery of Sikeston was appointed commissioner to hear testimony in said proceeding and directed to file his findings of fact and conclusions of law in this court. In compliance with his appointment and commission the said M. E. Montgomery has reported to this court his findings of fact and conclusions of law, as follows:

"The information sets up that the accused was tax attorney from 1932, until 1935, by appointment of the County Court of Pemiscot County, Missouri, for Drainage Districts Number Six and Eight of

said County, and then charges the accused with a number of specifications of infidelity to the interests of his said districts, in the handling of numerous drainage tax suits brought by accused in behalf of said districts.

"Omitting formal averments, which were not disputed, the petition may be boiled down to a charge that the accused, as such tax attorney entered into wrongful agreements with delinquent drainage taxpayers to so manipulate the handling of tax suits against them, as to enable them to bid in their lands at the tax sales for the approximate amount of the court costs, including accused's attorney fee, thereby enabling them to defraud said drainage districts (and their bondholders) out of their drainage taxes; and that pursuant to such understandings, the accused procured tax sales to be held in the absence of rival bidders, and withdrew such sales when rival bidding was in evidence, or was in prospect.

"The answer admitted accused's employment as tax attorney, but denied any wrongful agreements or conduct, and sets up numerous surrounding facts and circumstances, as explanatory of accused's actions in the handling of these tax suits.

"Informants relied on circumstantial evidence to prove the wrongful agreements alleged, there being little direct evidence outside of admissions by accused, to support such specification. To refute this charge, accused produced a number of the delinquent taxpayers with whom the information charged that he conspired, and they all denied having any such arrangements with accused.

"Accused filed more than five hundred tax suits, but he did not take judgments, nor direct executions, except in those suits where the defendants therein, requested that such action be taken. His explanation of why he extended to defendants this unusual consideration, was that the Hon. J. E. Duncan, Judge of the Circuit Court, had ruled and publicly stated from the bench, that economic conditions being bad, he would not enter tax judgments, nor permit sales, unless the landowners so requested. And (Ex) Judge Duncan called as a witness by accused, corroborated accused's statement as to his attitude on this matter. Accused's brief refers to this as an 'Arbitrary ruling,' and his counsel agreed that it was wholly beyond the power of the court, but that the court just 'Took the bit in his teeth.' (T. 188.) However, accused made no claim that he protested in any manner against such ruling, and the inference, from this and other evidence to be hereinafter noted, would seem to be, that it met with his hearty sanction.

"There was no dispute that over a period of about fifteen months, eleven sales (days) were held, involving more than three hundred (300) tracts of land, a substantial portion of which was some of the best lands in the county, without netting the districts anything what-

ever, accused's brief (page 7) stating that 'The land was sold for approximately the amount of the costs in the various cases.'

"Neither was it disputed that some sales were withdrawn while bidding was in progress, or was about to begin, and then the property sold later the same day, but the evidence was conflicting as to whether accused or the sheriff (who had died shortly before the hearing), was responsible for such actions.

"And accused admitted that after R. L. (Bob) Ward had run one piece of land up on the owner to about $1100.00, it was resold about twenty minutes later (T. 85 and 86), the owner having advised the sheriff that he would not pay his bid, and on this second sale, it was knocked off on a bid of only $98.00 (Mr. Ward had left and gone to his office in the meantime).

"Accused testified that he was present at both of said sales, but that he said nothing either *pro* or *con* as to conducting them. By way of explanation of his non-participation, he testified that he was without any authority to interfere because the executions were directed to the Sheriff and not to accused, and furthermore that he was employed merely to reduce these tax claims to judgment, and had no responsibility to look after the interests of the districts at the tax sales anyway (T. 408). In other words, accused's testimony at the hearing, was a disclaimer of any authority or responsibility, and that he attended the tax sales on his own personal account to see that the sales brought the amount of his attorney fee and court costs, many sales of prior years having failed to do that, to the loss of those who had fees in such cases.

"Before proceeding to a more detailed consideration of the evidence, we pause to dispose of two preliminary matters:

"FIRST: Accused's Plea in Abatement.

"SECOND: Accused's objection to the admissibility of certain evidence.

"Accused contends that at the time this suit was filed, another suit, involving the same cause of action, was then pending *in the Supreme Court,* hence that this cause should abate.

"The facts upon which accused relies are about as follows (T. 519):

"The State Bar Committee originally filed a disbarment suit against accused in the Pemiscot County Circuit Court. Thereafter at the behest of said Bar Committee, the court entered an order dismissing said suit, over accused's objection. Accused appealed said order of dismissal to the Supreme Court pursuant to Sec. 9 of Rule 36 of the Supreme Court rules. However, that court transferred said appeal to this Court on the ground that the Supreme Court had no jurisdiction.

"Accused says that the Supreme Court was in error in concluding that it had no jurisdiction, and since it failed to decide the appeal

on the merits, that this original cause is still pending in the Supreme Court (Accused's brief, pp. 24 to 28). Accused further contends that the opinion written by this Court (*In Re* Pate, 107 S. W. (2d) 157), following the above transfer, is a nullity because this court had no jurisdiction of the cause to decide anything, but even if not a nullity for want of jurisdiction, it conflicts with the order of the Supreme Court transferring the cause to this Court, which order, accused says was tantamount to a holding that an appeal would lie from the order of dismissal (to some appellate court), hence that this court's holding that no appeal would lie (from the order of dismissal), was therefore subject to be quashed for such conflict. *Certiorari* was applied for and denied, and said opinion of this court became final.

"Counsel for accused concedes that the Circuit Court entered its order of dismissal prior to the time of the filing of the present proceedings. And the commissioner understands that this court's holding to the effect that with the entry of that order, the original proceeding was then and there terminated without right of appeal, is a final judicial determination of that matter by which the parties are conclusively bound. Hence, it must be accepted as a fact, for all purposes in this case, that the original proceedings were terminated before the present suit was filed, and for that reason, accused has no standing on his plea in abatement seeking to establish the contrary.

"Accused's plea in abatement must fail for the further reason that the Supreme Court's holding that it had no jurisdiction of the attempted appeal in the original case, was also a final judicial determination of that point, overriding accused's contention in his plea in abatement, that such court did (does) have jurisdiction. So much for the plea in abatement.

"Accused charges that it was error to admit in evidence, over accused's objection, a transcript of the testimony taken at the preliminary investigation of this case by the State Bar Committee. This transcript was offered as a whole, and accused's objection was as to the transcript *as a whole* (T. 425 to 427), and not as to any particular part(s).

"Said transcript contained transcripts of testimony taken in the Circuit Court of Pemiscot County on motions to set aside some of these drainage tax sales. Accused himself, was called as a witness and testified on these motions, and likewise testified before the Bar Committee. Such testimony was evidently competent in the case at bar on the theory that it constituted admissions of accused against interest. [Hudlow v. Langerhans, 91 S. W. (2d) 629 (2), l. c. 632, 633.]

"Thus it appears that the Bar Committee transcript contained at least some evidence that was competent in the case at bar, and, as the commissioner indicated at the time this testimony was offered

(T. 427), he thinks that it was not incumbent on him, of his own motion, to go through this transcript piecemeal, and attempt to separate the wheat from the chaff. Hence there was no error in admitting such transcript over the objections as made. [Third Natl. Bank v. Yorkshire Ins. Co., 267 S. W. 445 (7), l. c. 450; Albert v. Dolan, 27 S. W. (2d) 438 (6), l. c. 441; Weinshenk v. Sullivan, 100 S. W. (2d) 66 (5), l. c. 70.]

"However, the commissioner is of the opinion that the admission of this evidence was without error for the following additional reasons.

"It was admitted that witness Bob Ward, was physically unable to testify at the time of the hearing of the case a bar, and that S. E. Juden, the former sheriff, was then dead. And as to the other witness, whose testimony appeared in the Bar Committee Transcript, accused made no objection that any of them were in the jurisdiction of the Court, or were available as witnesses. It was further admitted that accused was present with counsel at the Bar Committee hearing, and that he had been afforded full opportunity to cross-examine the witnesses (T. 426). And he makes no attempt to show that the transcript is incorrect in any particular; nor does he attempt to point out how his rights have been in anywise prejudiced by the admission of this evidence.

"In the case of *In Re* Lacy, 112 S. W. (2d) 594 (5 to 10), l. c. 603 and 604, the St. Louis Court of Appeals dealt with a somewhat similar proposition as follows:

"The respondent contends that the commissioner erred in admitting the evidence of Herbert Keeton, given in the trial of State v. Lacy. It was shown that Keeton was absent from his usual place of abode in the city of St. Louis; that informants had made a diligent search for him and had been unable to locate him; that in the State case the respondent was charged with corrupting and attempting to corrupt Edward L. Anna, a juror, in the Paul Richard's case; that in the information the informants desired an inquiry into the same charges; and that respondent had an opportunity to and did actually cross-examine Keeton in the State case. Under this showing of the facts, it is the opinion of the commissioner that the evidence of Keeton in the former trial was competent. (Citing cases.)"

. . . . . . .

"The inquiry (in disbarment cases) *should not be limited, or circumscribed, by the strict rules of evidence.* (All italics in this opinion are the commissioners.)

" 'In this proceeding the informants are investigating and making an inquiry into the conduct of respondent in a former trial. In his testimony in that trial, Keeton described the conduct of respondent.

He was properly cross-examined, and we think that his testimony is admissible in this inquiry. (Citing cases.)'

"The commissioner thinks that the above holding in the Lacy case, is good authority on the admissibility of the Bar Committee transcript in the case at bar.

"We proceed now to a consideration of the case on the merits.

"We will deal first with accused's testimony (T. 408) that he had performed his full duty when he reduced these tax claims to judgment, and that he had no obligation to protect the interests of these drainage districts at the tax sales.

"The County Court's order appointing accused as tax attorney, was general in its terms, reading as follows:

" 'The application of Sharon J. Pate for appointment of drainage tax attorney, is now taken up by the Court, and Sharon J. Pate is by the Court appointed *Tax Attorney* for all drainage districts under the supervision of the County Court.' (T. 428.)

"It contains no suggestion that accused's employment as 'tax attorney' was limited in any manner, but to the contrary, indicates that he was being employed to represent the districts in all matters relating to taxes. If such employment had been intended as other than general, surely the order would have contained at least some suggestion to that effect.

"Accused testified that his appointment was made pursuant to a written application, but the contents of said application were not offered in evidence. In the absence of a showing that he sought employment merely to reduce tax claims to judgment, evidently we are justified in assuming that his application corresponded to the above order appointing him.

"While accused testified that the firm of Ward & Reeves represented these drainage districts in some legal matters, he made no claim that said firm, or any other attorney, represented such districts in any manner connected with these tax sales (T. 420). It would be singular indeed, for the County Court to employ an attorney to reduce tax claims to judgments, and then leave the districts wholly unrepresented in the important matter of trying to enforce payment of such judgments.

"Accused's testimony was further as to the effect that he asked for executions without consulting with the county court as to the advisability of such action, that he attended the sales, and that he accepted the full amount of the attorney fee allowed to the 'Tax Attorney' as part of the court costs, as provided for by statute, without rebating any portion thereof.

"Accused admitted that he never at any time, in any manner, called the County Court's attention to the fact that he considered his employment as merely to reduce tax claims to judgment; nor ad-

vised them that he was not doing all within his power to protect the interests of the Districts at these tax sales; nor discuss with them the prospects or results of any of these sales; nor the advisability of the holding of any of such sales. His explanation of this was that the members of the County Court were in attendance at these sales, and were thereby fully advised of the situation.

"However, Judge J. H. McFarland called as a witness *by accused,* testified that he was Presiding Judge of the County Court at the time of accused's appointment, and all during his three year term as tax attorney, and that he (witness) *did not attend any of these tax sales,* except that he did attend one or two sales where the county had a school fund mortgage on some land to be sold, and that he attended such sales only for the purpose of looking after the interests of the school fund. He further testified that it was his understanding that accused was employed for the purpose of the *'collection of these drainage taxes'* (T. 495). Judge McFarland appeared to be an exceedingly frank and impressive witness.

"Hon. M. R. Rowland, another member of the county court, also called as a witness *by accused,* was not asked as to what he understood accused's duties were. And the only tax sale(s) he mentioned attending, was where some land was being sold which was owned by a company for which he was farm manager (T. 501). The other judge of the county court was not called as a witness.

"His brief makes no mention of his testimony to the effect that he considered his employment as ended when he secured judgments on these tax claims, so he appears to have abandoned this point. However, the commissioner thinks that the above testimony conclusively shows that accused fully understood that his employment as tax attorney, was general, and included the duty to look after the interest of these districts at these tax sales.

"Sec. 15 of Rule 35 of the Canons of Ethics adopted by our Supreme Court, provides in part, as follows:

" 'The lawyer owes "entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmonst learning and ability," to the end that nothing be taken, or be withheld from him, save by the rules of law, legally applied. No fear of judicial disfavor or public unpopularity, should restrain him from the full discharge of his duty. In the judicial forum the client is entitled to the benefit of any and every remedy and defense that is authorized by the law of the land, and he may expect his lawyer to assert every such remedy or defense. . . .'

"In 2 R. C. L., page 966, we find applicable comment, as follows:

" 'The relation of attorney and client is, as has been seen, one of the highest trust and confidence, requiring from the attorney the observance of the *utmost good faith toward his client,* . . . The

burden is on the attorney to show that the transaction is fair and equitable, *and that the client was fully informed of his rights and interests* in the subject-matter· of the transaction, and of the nature and effect of the transaction itself, and was so placed as to be able to deal with the attorney at arm's length. . . .'

"So even if it be conceded that accused did in fact regard his employment as merely to reduce these tax claims to judgment, as he testified, then unquestionably he failed to measure up to the degree of fidelity he owed to these drainage districts, when he failed to fully and specifically advise the county court that he did so regard his employment, and that he was not looking after the interests of such districts at these tax sales, and particularly in view of the fact that the evidence indicates that he was realizing the full amount of his attorney fee in every case, and that he had full knowledge that said districts' tax liens, running into thousands of dollars, were being sacrificed without yielding the districts themselves anything whatever in return.* (T. 153, 193 and 24.)

"Informants have cited some cases to the effect that accused's legal authority and duty, did not terminate until after sale of the delinquent lands under the tax judgments. While that contention is doubtless correct, such fact is only incidental here, where the charge against accused is *unfaithful conduct*. The question here is not as to the extent of accused's authority, but as to whether he faithfully performed his duties *as he understood them*. We pass now to a consideration of that matter.

"Accused brought more than five hundred drainage tax suits, and while not legally required to do so, he followed the usual practice in such cases, and made the mortgagees, as well as the holders of the legal title, defendants in such suits. Since under that procedure, purchasers at tax sales stood to acquire the delinquent lands free of all mortgage liens, it necessarily followed that mortgagees would be deeply interested in seeing that the taxes were paid, and the necessity of proceeding to judgment and sale, thereby eliminated; or failing in this, to bid at the tax sale to protect their mortgage debts. And third parties would naturally be more disposed to bid at such sales if the lands were being sold freed of the mortgage liens, rather than subject to such liens. *That accused so understood* the effect of judgments against mortgagees, is shown by his own testimony appearing at pages 61 and 392 of the Transcript.

"But the record discloses that accused had dismissals entered as to many mortgagee defendants prior to judgment, and he testified '(T. 399) that he could not recall taking a single judgment against any mortgagee, and no case has been called to the commissioner's attention where such a judgment was taken.

"When accused was asked at the hearing, why such dismissals were

entered, he frankly admitted that he was unable to give any explanation. (T. 395 to 398.) However, on a motion to set aside one of these tax sales, we find that he testified as follows:

" 'Q. They had a loan on that land? A. Did, as I recall it, he went to see Mr. Bernard, since the Federal Land Bank had a loan against it, Mr. Bernard would have to look after that. Walter called me on the 'phone, I believe, *WHEREIN THE CONSIDERATION WAS MADE TO DISMISS AGAINST THE FEDERAL LAND BANK UPON AGREEMENT TO PAY THE COURT COSTS.*

" 'Q. *IN OTHER WORDS, YOU AGREED TO DISMISS AS TO THE LAND BANK IF THE LAND BANK WOULD GUARANTEE THE COSTS IN THE CASES?* A. *AT LEAST THE COSTS.*

" 'Q. *At least the costs?* A. *Yes sir.* (T. 57.)

" 'Q. In these cases here, the Hazel case and the Guise case, you made an agreement to dismiss before judgment was taken, as to the Federal Land Bank? A. As to the Federal Land Bank, we dismissed, and also dismissed as to the Bank of Caruthersville where they had mortgages on land.

" 'Q. Was that the general practice? A. *WE WASN'T GOING TO HAVE THEM SOLD OUT.* (T. 58.)

"This testimony takes on an added significance when we note that accused further testified:

" 'A. Mr. Welbourn advised me, he represented the Federal Land Bank, *that they would pay the taxes when they had to,* I think Mr. Welbourn will substiantiate that.' (T. 57 & 58).

. . . . . . .

" 'Q. Mr. Pate, you spoke about having a conversation with me about the tax, I will ask you if that didn't come out in this way, I was talking about us being the mortgagee, and *didn't* want to pay the tax until we had to? A. That is true enough, Mr. Welbourn.' (T. 65 & 66.)

" 'A. My recollection is that Mr. Bernard came down to my office and we discussed the Hazel matter there, of course it was a pretty nice thing for the Land Bank, he was working in their interest, *and he personally guaranteed the costs,* that wasn't much of a gamble for them, if somebody bought the land in, *it would be bought subject to the mortgage.*

" 'Q. Do you know the amount of the mortgage? A. I do not.

" 'Q. In a general way? A. In a general way I think around $30,000.00, it might have been a trifle higher, or a trifle lower.' (T. 61.)

"With reference to such dismissals, *Bob Ward* testified:

" '. . . Then the next thing I know about it, is that some of these fellows that had mortgages and who were sued, Were refusing

to sign this agreement, like the Federal Land Bank, and maybe some of the rest of them, so in order to get judgment against that land where the—they were dismissed as to the mortgage holders. That is true in Elmer Hazel's case, and Mr. Guy's case, and some others.

"'And in those cases like Mr. Hazel and Mr. Guy, *the mortgage was bigger than the value of the land, so when you dismissed as to the mortgage there was no reason why a fellow would bid upon the land, because you take it subject to the mortgage. . . .*' (T. 10.)

"The only explanation of these dismissals we find in accused's brief, appears at page 18a, and is as follows:

"'In some of these cases it was necessary to dismiss as to the mortgages in order to secure a judgment by consent, the court refusing to allow judgments otherwise.

"'If these judgments had not been obtained and the sales made at the time they were made, the land would have been sold for general state and county taxes, and the judgments for drainage taxes would have been useless.'

"While immediate judgments at the expense of dismissals as to mortgages, were doubtless good bargains for the mortgagees and land-owners, and for accused personally, since it enabled him to promptly collect his attorney fees, it availed the drainage districts nothing to have judgments against the holders of the legal title only, on which none of its taxes were being realized. Furthermore, the record contained no very definite showing that *state and county taxes were delinquent* on any considerable portion of these lands; accused's witness, Judge McFarland's testimony was to the contrary, being to the effect that most of the people had paid their state and county taxes, defaulting only on their 'improvement' taxes. (T. 496.)

"It cannot be questioned that such dismissals, resulted in depriving these drainage districts of most hopeful sources for realizing their taxes out of these delinquent lands. If such dismissals had not been entered, it is quite apparent that mortgagees would have been greatly interested in seeing that the owners redeemed this property from these superior tax liens in order to safeguard the mortgage liens; and if such redemption had not been made prior to the execution sale, it is just as apparent that such mortgagees (not to mention third parties), would have been anxious bidders at such sales. The attitude of the mortgagees was frankly stated by accused himself, when he testified that they *didn't want to pay the tax until they had to*. (T. 57, 58, 65 & 66.)

"While such dismissals do not necessarily prove bad faith, it certainly cannot be questioned that, without consulting with the County Court as to the advisability of his actions, accused did thereby greatly prejudice his district's chances of collecting these drainage taxes. And since he advances no reason, consistent with the interests of his

clients, for so doing, it necessarily follows that when, on his own authority, he voluntarily sacrificed judgments against these mortgagees, he convicted himself of either bad motives or gross dereliction. Although accused testified that his responsibility to the districts was at an end when judgments were obtained, he made no claim that he was not charged with full responsibility to obtain the best judgments possible for his districts.

"A very plausible explanation of these dismissals is at once apparent, if we conclude that between the time of the filing of these tax suits and the taking of judgments, an understanding came about that these suits were to be 'settled' for just the amount of the court costs, a result which accused admits did in fact come to pass.

"Mortgagees were naturally interested in seeing these superior tax liens eliminated, provided it could be accomplished without disturbance of their own mortgage liens, but that they would have been most reluctant to stand mute and see tax judgments entered against themselves, which, to say the least, would have put their mortgage liens in jeopardy, and which they could have easily avoided by paying (or seeing that the owners paid) these drainage taxes, which in most instances, were substantially less than the value of the mortgage security they stood to lose. And even with all the assurance that anyone could have possibly given these mortgagees that the owners (mortgage debtors) would be able to bid their property in at the tax sales, and would continue to recognize these mortgage liens, tax judgments against such mortgagees, would have been attended with uncertainties and possible complications that no loan company would have thought of countenancing. Hence, dismissals as to mortgages, was essential to a 'settlement for costs' understanding. And too, the likelihood of competition bidding would be minimized if dismissals were entered as to mortgagees, and the land sold subject to the mortgages, rather than free of such liens.

"At page 7 of his brief, accused points out that these landowners wanted their lands sold before Circuit Judge Duncan's term expired, as they regarded him as friendly to their interests. This suggestion is an implied admission that accused was being guided in this matter by the wishes of the landowners, rather than trying to serve the interests of his clients—the drainage districts—because while the landowners may have had good reason to so desire, accused makes no claim that he thought the interests of his districts would likely be better served by Judge Duncan than by his prospective successor. In fact his testimony that Judge Duncan refused to enter judgments in behalf of the districts unless requested by the landowners, tends to indicate the exact contrary.

"Accused testified that judgments were entered and execution sales ordered only where desired by the delinquent landowners. The

fact that these landowners resorted to the unusual procedure of stipulating for judgment *against themselves, AND REQUESTING THAT THEIR LANDS BE SOLD,* clearly indicates that they must have had good reason to believe that they would be able to bid their lands in for less than the taxes, because they certainly would not have voluntarily requested the incurring of these additional costs incident to judgments and sales, if they expected to have to pay the judgment in full, which judgment would carry these additional costs with it. And, while it is true that the bargains these landowners evidently anticipated, could have resulted without any fault on the part of accused, the very fact that they did request such sales, should have been convincing evidence to accused that the interest of the landowners rather than that of the districts, were likely to be served by holding such sales when so requested, and should have been an unmistakable warning to the accused, that the interests of his districts demanded that these sales be postponed to await a more favorable time for competitive bidding.

''But notwithstanding this warning, and notwithstanding the fact that the outcome of prior sales, had proven such warning to be altogether well founded, accused continued to dismiss as to mortgagees, taking judgments against the owners only, and continued to ask for executions, with the same unfortunate outcome over and over again, until in a period of about 15 months, 11 sales (days) had been held, involving more than 300 pieces of property, a substantial portion of which was of the best lands in the county (T. 6, 212, 213 and 486) and 'worth a great deal more than the taxes against it' (T. 13 & 34), without netting the districts anything whatever on their tax claims, while the accused was collecting the full amount of his attorney fee in practically every case, and was thereby enriched in excess of $6500.00 (T. 372 and 374.)

''Since the districts were realizing nothing whatever out of the foreclosures of their tax liens, no one can question that the ultimate result of accused's representation was a substantial dis-service to his clients. As to whether such dis-service was intentional or otherwise, we will next consider.

''Accused admitted writing the following letter to a Mrs. Clara Bigham:

'' 'My dear Mrs. Bigham: Court is again coming on and I note that two drainage tax suits are still pending against you. They total approximately $1600. If you are interested and will come down to the office, *I am confident that I CAN SHOW A WAY TO RID YOURSELF OF THESE TAXES* for a sum not to exceed $300. *I shall be pleased* if you will call me and make an engagement. Sincerely yours, SHARON PATE.' (T. 376.)

"Accused further testified:

" 'Q. *This $300 you mentioned there is approximately the amount of the court costs and your fee?* A. *Yes.*

" 'Q. And she can get out of that? A. I don't say she can; possibly she can.

" 'Q. "I can show you a way to rid yourself of these taxes for approximately $300." You were going to do it? A. I was going to show her what the rest of them were doing, and *if SHE COULD, IT WOULD BE FINE.'* (T. 165.)

. . . . . . .

" 'Q. Will you please tell us, Mr. Pate, what you meant by that letter to Mrs. Bigham, that you could show her a way to rid herself of those taxes? A. I can tell you, yes. I would have told her, had she came down to the office, just exactly what other folks were doing; and that was that they were having this land sold and they were buying it themselves, and nobody was bidding against them.'

. . . . . . .

" 'Q. And it was agreeable with you if she came down here and bid her land in on the same basis that others were bidding it in. Is that correct? A. Well, you see the answer to that is, this Mrs. Bigham I had known all my life, and she was a widow woman, and I honestly didn't see any reason why she shouldn't do what the others were doing.

" 'Q. And you were going to tell her that? A. The chances are I would have told her that.

" 'Q. And it was agreeable, so far as you were concerned, for her to do it? A. All the rest of them were doing it. Everybody else was doing it. (T. 377 and 378.)

"Accused further testified as to advising other landowners, as follows:

" '*I wrote any number of letters about that where I personally knew them, were acquainted with them.* (T. 59.)

. . . . . . .

" 'Q. What talk, if any, did you have with Mr. Martin (a landowner) about it? A. I said this, that *I didn't believe that under conditions,* times, that the local home people would bid against each other.' (T. 81.)

. . . . . . .

" 'A. The only conversation I recall having along that line was that I didn't believe the home folks would bid against each other under the conditions of times, but that it would have to bring the court costs.

" 'Q. Why did you tell him (Mr. Martin) it would have to bring the court costs? A. The advertising, the sheriff's fee, the Clerk's fee, and, incidentally my own.

" 'Q. Why did you tell him it would have to bring the court costs? A. Because it would have to bring the court costs.

" 'Q. You didn't mean that there was any law like that? A. No, I didn't mean there was any law like that, I meant that the property could possibly be bought for the court costs.' (T. 82.)

"*W. E. Ray, who* represented a mortgagee, testified as follows; with reference to a conversation with accused:

" 'Q. What did he say? A. Said they were going through with them, and take judgment, and he also told me, I think in this conversation that the present time *would be a GOOD TIME TO SELL them, said that the chances were that these people down here were not going to bid against each other* at the sales, like they were doing elsewhere on the land, and that the owners might have a chance to buy it in for less than the judgment. . . . (T. 106.)

"*Bob Ward* testified as follows, with reference to signing a *stipulation for judgment* for some landowners whom he represented:

" ' . . . He (Mr. Pate) either called me or I called him. He wanted to know if I signed that, and I told Mr. Pate that I couldn't sign that; that that didn't look right to me, and in that conversation I asked him—he said he wanted—*these landowners wanted it done that way, and he said THEY WOULD SAVE MONEY BY IT,* and hearing these rumors that there was a deal on I asked him what do you mean by that. He said they could buy this land, and *these other landowners are not going to bid on it, they can* buy this land in for the costs. I said "what if somebody bids against them" and his statement was there, *that the sales would not be held then,* if anybody bids against them, or something to that effect. That might not be exactly the language, but if the sales,—I said I just couldn't do that. Mr. Pate seemed a little angered about that, and said "I understand you say this is collusion." I said "Yes, I do say so, and I am not going to be a party to it." ' (T. 8 to 9.)

" ' . . . he said, "the agreement is just this, that I am letting these judgments be taken at this term of court by consent of the land-owners, and the land will sell at this term provided the fellows will *bid the amount of the costs." I said,* "You mean the amount of the court costs and your attorney fee?" And he said, "Yes, *they are to buy the land in for the attorney fee* and costs." And I said, "Well, I couldn't be a party to that." He said, "I understood you to say that is conspiracy." And I said "I think it is a conspiracy, I don't think you can enter into that kind of an agreement." ' (T. 67.)

"Elmer Hazel, a delinquent landowner, testified as follows:

" 'Q. What did you say to him? A. Well, he (Pate) said *he thought possibly I could buy the land back cheaper,* said I might buy the land back cheaper, didn't tell me I could do it.' (T. 70.)

"Section 6 of Rule 35 of the Supreme Court, provides:

" 'It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.'

"Section 37 of said rules provides in part as follows:

" ' . . . A lawyer should not continue employment when he discovers that his obligation prevents the performance of his full duty to his former, or to his new client.'

"We quote again from *Bob Ward's* testimony with reference to the conduct and withdrawal of sales:

" ' . . . They put up one piece of the *Juden land,* I think 160 acres, I am not certain about the number of acres, might have been 180, and Mr. Ray bid $125.00 and I said ''$250.00.'' And *Sharon Pate* turned around to me and said, ''What do you mean?'' I said, ''I came to bid on this land.'' He said, *''You are for the bondholders, these big fellows.''* And I said ''No, I have a farm in that district, I own a farm and have some clients in the district who have farms, and we don't think it is fair for us to pay our taxes and these fellows who own big farms get out of paying their taxes and buy their land in for the costs, and you can't get by with that.'' *And he said,* ''That sale is withdrawn.'' And the sheriff put that one under the bottom, and didn't call it any more, and then started to read the next Juden sale and Mr. Ray said to me, ''Going to bid on this?'' And I said, ''Yes.'' He finally asked me how much I was going to bid and I said, ''I am authorized to bid on this land, and I am not going to let the deal go through and see the land sacrificed just for the costs of the officers and the attorney.'' Then that sale was withdrawn, all of the Juden sales, three of them were withdrawn.' (T. 110 and 111.)

. . . . . . .

" ' . . . When the first piece of Martin land was put up Mr. Pate said to me ''Are you going to bid on the Martin land?'' And I said ''Yes, I am going to bid on the Martin land.'' Then *he said, ''Mr. Sheriff withdraw it.''* The sheriff went through the list and put the Martin land at the bottom, it was withdrawn from sale.' (T. 112.)

"Quoting from Sheriff Juden's testimony, relative to these matters:

"I think the first piece offered was a piece of the *Juden land,* the first piece of the Juden land was put up and somebody bid on it, and you (Mr. Ward) made a bid on it, and the attorney—

"Q. What happened then? A. The attorney for the drainage district number 6, said to withdraw the sale, and I said I would if nobody objected to it, and nobody said a word and I withdrew it.

"Q. Who was the fellow who said to withdraw that? A. Sharron Pate.

494

"Q. Was any conversation had before he said for you to withdraw the sale? A. I don't recall any, Mr. Ward.

. . . . . .

"Q. Didn't he (Mr. Pate) ask me (Mr. Ward) who I represented, and I said I represented the bondholders and landowners that I owned a farm in that district myself, do you remember that, Judge? "Q. I think you said you represented the bondholders in Number 6? Now, Judge when he said that was withdrawn, you put that on the bottom of your sales? A. I quit then, and got Scrap Chism's next. (T. 93.)

. . . . . .

"Q. Well, don't you remember Sharon Pate asking me if I was going to bid on the *Martin land,* I told him that I was, and then he told you to withdraw the Martin land? A. I remember that he told me to withdraw the Martin land. (T. 94.) "Q. How long after that was it until you had another sale? A. I judge about an hour, I went in and settled up with those that had bought and after I had finished that *Sharon came in* and said, 'Well, let's finish up the sales.' And I said, 'All right, here we go.'

. . . . . .

"Q. And you sold the same *Juden land* that I (Mr. Ward) was bidding on? A. Yes, sir. "Q. And you sold the *Martin land* that had been withdrawn at the first sale? A. Yes, sir." (T. 95.) "Quoting from the testimony of Roy Harper, an attorney for some of the landowners: "Q. And when I (Mr. Ward) told him I was going to bid, what happened? A. *He (Mr. Pate)said he would just stop the sale.* "Q. That that was withdrawn? A. Yes, sir. "Q. Was there any other statement made? A. In regard to the Juden land? "Q. Yes, at that time didn't Mr. Ray say, 'Are you going to bid on this land?' And didn't I make the statement to Mr. Martin and the whole crowd that I was going to bid on all the land that was worth the taxes? A. Yes, sir, as I recall it you made that statement. "Q. When the next piece of Juden land was struck what happened, was it withdrawn? A. As I recall it there was only one piece of the Juden property put up down there the first time, you bid $250.00 and the sale was stopped on the three pieces of the Juden land, it had automatically been stopped, they were at the top of the list and were then shoved to the bottom. "Q. At whose request? A. I didn't hear anyone request that, *heard Sharon Pate say, 'Stop the sale.'* " (T. 99 & 100.) "At the hearing accused testified to the effect that he gave the sheriff no directions relative to the conduct or withdrawal of sales,

and he produced witnesses who testified that they were present at the sales but did not hear the accused give any directions. However, in addition to the above testimony to the contrary, we find that accused himself testified as follows on a motion to set aside one of these sales:

"Q. What happened to the Juden sale? A. In the Juden sale Mr. W. E. Ray bid $2550.00 (Note—apparently a typographical error as to the amount) and *I SAID 'NO SALE,'* that was on the Juden property." (T. 84).

. . . . . . .

"Q. Did *you offer* any more of the Juden land? A. No, sir, there was three or four more pieces in Number Six, Harry Brown's land and you (Ward) didn't bid on that.

"Q. Did *you offer* the Juden land any more? A. No, sir.

"Q. Why didn't *you offer* it? A. I can't say, just went ahead and sold the next property."

. . . . . . .

"Q. How long was it after the first attempt was it that *you* came back the second time and *had another sale?* A. I imagine twenty minutes." (T. 85)

. . . . . . .

"Q. How come you to come back in about twenty minutes? A. I came back over to the court house here, met Clinton Cunningham out in front, and he said he couldn't pay the bid of $1002.00 he made on 80 acres of land, came to the sheriff's office.

"Q. Then what did you do? A. Went back out front and sold the Clinton Cunningham property, and likewise sold the *Martin and Juden land.*" (T. 86).

"Q. And after I had bid one thousand dollars on it and come away, *you* and the sheriff sold it for $98.00 without calling me? A. You would have been in the same shape Clinton was, couldn't have paid for it." (T. 87).

. . . . . . .

"Q. *Why did you tell the sheriff to withdraw the sale when I bid more on the land than the owners did?* A. *BECAUSE YOU SAID YOU REPRESENTED THE BOND OWNERS OF NUMBER 6.*

"Q. And the land owners? A. You didn't say anything about the land owners, you said bond owners." (T. 88).

"Relative to the Clinton Cunningham tract, which was bid up to $1100.00 and then resold for $98.00, *Mr. Ward* testified:

"I bid, as I remember, up to $1100.00 on the 80 acres of land which would have paid all the drainage tax, all the county tax, and then he bid, that is young Clint, but I think $1115.00, when he bid that why I said 'Let him have it,' and it was knocked off to him. Then

Sharon Pate said 'Well, he hasn't got a dime, he can't pay for it.' Then Judge Juden said ''If he don't pay for it *I will sell it again at ONE O'CLOCK,''* and I said "All right.'" (T. 112).

''With reference to this matter, *accused* denied hearing the sheriff announce that if Cunningham failed to pay his bid the resale would be at *One O'clock,* and admitted that the second sale was held in Mr. Ward's absence, about twenty minutes after the first sale (T. 85), and further testified before the Bar Investigating Committee:

''Q. You (Pate) knew Mr. Ward had bid a short time before that $1115? A. I think $1100.

''Q. And you made no effort to get him there so he could bid again? A. No, sir. I didn't make any effort there.

''Q. You say as a lawyer you owed no obligation to your execution creditor to see that the property sold for as much as you could get for it? A. I said I owed no duty to the drainage district or anybody else to get out and run people in to bid at an execution sale.'' (T. 171).

*"Clinton Cunningham,* the owner, testified before the Commissioner as follows:

''Q. Now, the charge is here that the sheriff made the announcement that if you wouldn't pay for that land by *1:00 o'clock* he was going to sell it again. Was any announcement made like that there in your presence? A. There might have been. It has been so long ago that I don't—I believe something was said about that. Bob Ward and I bid, we bid there for quite a while. I believe something was said that I wouldn't pay for it—he said he didn't believe I would pay for it because I run it up so high.

''Q. Did you hear the sheriff say that he would sell it again at *1:00 o'clock* if you didn't pay for it? A. I believe I did hear him say something like that. . . .'' (T. 447.)

''Accused testified as follows before the Bar Committee, as to holding these tax sales, and his purpose in attending:

''Q. Why were you wanting it sold under those conditions when the county was not getting any money? A. You understand a drainage tax attorney or attorney for the collector under the old law, of course they don't have that now, he is not on a salary at all. The only thing he gets for his services is what may be gotten out of the court costs, which is taxed.

''Q. Do I understand you, Mr. Pate, that you were consenting to the executions and the sale of this property under conditions where it was simply bringing the cost in order to enable you to get your cost? A. I was not consenting to anything except this. When the land was sold I was looking after my part together with the officer's—'' (T. 151.)

. . . . . . .

"Q. Did you know if the land was sold that if it didn't bring enough for taxes that it might effect the bondholders? . . . You didn't think anything about it? A. *I was not worrying.*

"Q. You were not worrying about that. *All you were worried about was your own interest?* A. Yes.

"Q. And you were worrying about your own interest; you were not worrying anything about the County Court, or the Drainage District? A. *I was not worried about them.* They have their own officers, *and they can protect them, their interests.*" (T. 158).

"It will be observed that he makes no claim that he attempted to serve the interests of either of his districts at any of these tax sales, and the above evidence can leave no doubt that his efforts were directed to serving the land owners, rather than his clients.

"The evidence discloses that after several of these sales had been held without netting the districts anything, the bondholders sent a Mr. Waugh, a young attorney from St. Louis, to bid for them at one of these sales 'To protect their interests.' Mr. Waugh's experience is well described in the following testimony of *Bob Ward:*

". . . On January 17th, they had this other big bunch of sales here, and the bondholders sent a young lawyer from St. Louis by the name of Waugh, associated some way with Allen. Mr. Allen was on his vacation and sent Mr. Waugh down to bid the land for sale in Number 8, and Number 6 too. This was January, '34. The first sale was in December, '33. Mr. Waugh came down here the day before, and came up and talked to me about it. I told him I didn't imagine any of this land would be sold when they found out the bondholders were going to protect themselves, and for him to go down and stay with the sheriff and be at the sale if he wanted to be.

"On the day of sale I had a case to try, and I came up here in court, and just before court met, the sheriff left his office and came up stairs, and Mr. Waugh was attacked by the crowd down there, and beat up and put to bed. He came up in court here, bloody as a hog, shirt torn, disheveled, and told the court that he was a member of the St. Louis bar, and that he was a regular licensed lawyer, and told the court what had happened to him, and that he would have to go to a doctor, and *asked the court not to sell the lands, not to let the sales go on, until he could get somebody, or be in position to represent his client.* . . . Judge Duncan told him all right, and he went to a doctor. The doctor put him to bed, and so they went ahead and sold that land, and Judge Duncan was not acting fast enough to suit them to sign up these deeds, and Mr. Steve Medling, a lawyer here, said he had been retained by these parties—

"MR. CLARK: Q. The landowners who had brought their own lands? A. Majority of them. And he wanted these deeds signed

up. That was the same day; the court house was full of people; the sales were over." (T. 22 & 23).

"With reference to this matter, accused testified that he was eating breakfast just across the street at the time of the assault; that the court sent for him, and advised him of the assault and *that Mr. Waugh had requested that the sales be put off, and that accused replied that the matter was entirely up to the court* (T. 421 & 422), and that the sales were held as advertised under the court's instruction. And he further testified:

"Whereupon, at one o'clock, I was present, and bid only the amount of the court costs, which I have done on other occasions. There were several there, and *no one bid.*"

"Q. You knew Waugh was here to protect this property? A. I understood Mr. Waugh was sent down here to bid. I have never seen the gentleman.

"Q. You knew that it was his purpose in being here at that time? A. I was told that. He didn't tell me.

"Q. You didn't remonstrate with Judge Duncan about having a sale? A. *I didn't remonstrate.*

"Q. You wanted the sale to go forward? A. *I had no interest in the matter.*

"Q. What's that? A. *I had no interest.*" (T. 173).

"Accused's brief points out that Mrs. Bigham failed to respond to accused's letter of invitation (Page 13 supra) and that she and some other landowners (voluntarily or otherwise), failed to reap the advantages of this tax procedure, with the result that the districts' losses from the manner in which these tax suits were handled, were minimized. It also suggests that there is some legal question as to whether the districts' liens were really extinguished in those cases where the owners bid the property in themselves. However, Informant's Exhibit No. 9 (T. 221 to 369) shows that some of these lands were bid in by persons other than the owners.

"We agree that the districts' losses may not have been as great as they could have been, had more of the landowners taken full advantage of the opportunity that accused apparently intended to be open to everybody, but we fail to see how this in anywise helps accused's situation, since he makes no claim that the fact that the districts were fortunate enough to be 'saved' to this extent, was brought about by anything he did, or attempted to do.

"His brief also points out, that many tax sales of prior years had failed to bring even the court costs, and that the sales conducted during accused's term as tax attorney, brought more than any of those prior sales. We readily agree that the record so shows. However, the record further shows that the sales of prior years were principally of undeveloped wet lands (T. 37, 480 & 503), while a substantial

portion of the sales during accused's term of office, involved some of the best lands in the County (T. 6, 212 & 486).

"We also agree with the accused that he had no obligation whatever to bid anything in behalf of the districts at these sales, since the County Court furnished him no money with which to pay bids. We further agree that there was nothing whatever wrong in him bidding the amount of the court costs, it being merely a matter of good business in his own behalf, without in anywise prejudicing the rights of his districts.

"But, it appears to the commissioner, that this is all beside the point now at issue, there being no charge here as to any bid that the accused made, or failed to make; and the amount the land sold for is really but incidental in this case. The complaint here is not as to any bidding by accused, but that he designedly used his office as tax attorney to prevent others from bidding, that he stifled bidding, and intentionally helped these land owners defeat payment of these drainage taxes, instead of trying to collect such taxes, as fidelity to his clients cause required him to do.

"While the commissioner feels that the accused and his attorneys, are to be commended for their frankness touching accused's actions in the matter under inquiry, he finds himself unable to agree with many of the conclusions that accused's brief draws as to his actions and intentions.

"'The commissioner thinks that the uniformly unfortunate outcome in this large number of tax suits did not come about by inadvertence but was the result of a definite well understood plan. And, to say the least, accused intentionally used his office as tax attorney, to help the plan succeed; without which help, any substantial degree of success would have been impossible. As to the origin of this plan, the commissioner further thinks that the inference most favorable to the accused, that can possibly be justified under this record, would be to conclude that this plan to defeat payment of these drainage taxes, did not rest on any express (formal) agreement, either oral or written, did not come into being all at once, nor spring from the mind of any one person, but rather it just 'developed' from the circumstances of the situation, following the filing of these drainage tax suits.' These circumstances were about as follows:

"Drainage improvements had been made when prices were high, and farm income was such that paying the taxes necessary to meet bond payments, was not difficult. But these conditions had materially changed, and even though much of these delinquent lands were really worth several times the amount of the taxes against them, nevertheless, under the depressed economic conditions, such taxes were proving exceedingly burdensome. These farm owners had taken substantial losses all along the line, and there was strong sentiment

500

in the County that bondholders should share this loss, at least to the extent of relieving these lands of a substantial portion of these drainage taxes. And since the bondholders were not doing this voluntarily, the general feeling was that most any means that could be found to accomplish such result, would be amply justified.

"An attorney whose integrity has never been questioned, representing a defendant landowner (T. 150 & 379), and knowing the general sentiment of the people, and the unlikelihood of local people bidding against the owner at the tax sale, and being practically without other recourse anyway, took the chance of stipulating for judgment *against his client*, and asking for an immediate sale, with the result that the owner was able to bid in his land at the tax sale for just the amount of the court costs. And thus, a much desired 'plan' had been 'found' that had proven its practicability by actual test.

"The news spread rapidly, and served as a cue to other delinquent landowners, and as Bob Ward vividly expresses it, there followed a great 'slew' (T. 20) of stipulations for judgments and sales, (T. 150). However, it is at once apparent, that the prime essential to any further success of this plan, was the paternal blessing of the drainage tax attorney, for without his cooperation, the plan was doomed in advance, and would have died aborning.

"Accused challenges the sufficiency of the information, and the sufficiency of the evidence under the information, and particularly with reference to the matters of fraud and conspiracy. While rights of great importance to the individual, and the bar as well, are litigated in disbarment cases, and loose procedure should not be countenanced, the courts have repeatedly held that the action being in the nature of an inquiry for the protection of the courts, the public and the profession, strict rules of procedure should be relaxed to the end that the fitness of an attorney to continue in the profession should be determined on the merits rather than on less worthy grounds.

"So without stopping to discuss the petition, or the evidence, from the standpoint of legal refinements, the commissioner thinks that accused's own admissions, taken with the supporting testimony in the record, conclusively shows that he wholly failed to try to serve the interests of his clients, but that he intentionally, actively and aggressively aided the cause of the landowners, with the result that out of a total of more than 300 drainage tax sales, involving much of the best lands in the County, his clients realized nothing whatever to apply on their obligations. And that accused was not unmindful of the fact that he was collecting the same attorney fee in every case (the full amount) that he would have realized had he collected these judgments for his clients, there can be but little doubt.

"No one can question that farming conditions were bad, and that any help by way of elimination of tax burdens, was much needed relief to a distressed enterprise. Neither can there be any doubt that there was strong public sentiment that drainage taxes were unduly burdensome, and that the loss should be shifted in part at least, from the landowners to the bondholders. But it is just as true, that no such shift should have been attempted by prostituting the processes of court. And, if such practice were to become general, and should be carried to its logical conclusion, the effect would be, not to bring desired relief, but to create chaos. And instead of the conditions of municipalities and their members, being improved by being relieved of some of their tax burdens, the result would be that municipal bonds would cease to be saleable, and their credit and ability to make necessary public improvements, and to function in an orderly manner, would be absolutely destroyed.

"*Bob Ward* testified:

"Q. Has there been a great deal of antagonistic feeling on the part of the landowners against the bondholders? A. I don't think so; until these sales were pulled off." (T. 34).

"And with reference to this matter, accused's counsel, Sam Corbett, testified:

"Q. There was a lot of resentment by the landowners against the bondholders? A. Lot of resentment about anybody bidding against the landowner on his land." (T. 188).

"While there was no evidence that the accused in any manner, encouraged the mass assault heretofore mentioned, an attorney Waugh, who came to bid at one of these tax sales, it certainly cannot be doubted that the improper manner in which these tax claims were handled, furnished the background and the motive for such an attack, without which it would have been altogether unlikely. It is to be remembered that these were not forced sales, where landowners were driven to desperation, but sales requested by the landowners themselves. And no doubt the court would have stopped such sales had the landowners desired it. Such facts tend to indicate that this assault grew out of an understanding that competitive bidding was not to be countenanced, rather than being merely ill considered action in an emergency.

"Accused produced the testimony of outstanding citizens, who have known him for many years, that he bore a good reputation, and there was no evidence to the contrary other than the inferences that may be drawn from his handling of these tax suits. As to these suits, there was no suggestion that he profited in any wise except to the extent of the attorney fees which were legally allowed to him by a court of law, and which were shown by proper public records. While such fees were quite substantial, they really amount-

502

ed to but little more than ten dollars per case for the more than 500 tax suits accused filed, which is less than one-half of the usual minimum attorney fee for circuit court cases.

"As above pointed out, the commissioner thinks that this record conclusively shows that in the handling of these tax suits, the accused was controlled and guided by considerations other than fidelity to the interests of his clients, and that he was largely responsible for a substantial miscarriage of justice. And while his offense should neither be condoned nor minimized, under all of the facts and circumstances in this case, the commissioner is disposed to leniency in the matter of discipline, and recommends that the accused be suspended from the practice of law for a period of six (6) months.

"All of which is respectfully submitted.

M. E. Montgomery, Commissioner."

It is therefore our opinion that the findings of fact and conclusions of law of said commissioner should in all things be approved, and that the said Sharon J. Pate, the respondent herein, be suspended from the further practice of law in this state for a period of six months from the 30th day of June, 1938, and that all costs in this cause be taxed against him.

It is so ordered. *Smith, J.*, and *Fulbright, J.*, concur.