MURRAY I. RESNICK *v.* SOLOMON KAPLAN
ET AL., etc.

[No. 873, September Term, 1980.]

*Decided September 2, 1981.*

The cause was argued before MORTON, MOYLAN and MOORE, JJ.

*Benjamin Lipsitz* for appellant.

*Edmund P. Dandridge, Jr.,* with whom were *George C. Doub, Jr.,* and *Venable, Baetjer & Howard* on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

This appeal represents only a part of the extensive litigation between former law partners which was spawned by the dissolution of their law firm in October, 1972.[1] The action below was for an accounting by the appellees — the four partners ("the Kaplan group") who continued in practice together — against the appellant ("Resnick"), their erstwhile partner who left and opened his own office. The Circuit Court for Baltimore City (Karwacki, J.) granted the Kaplan group's motion for partial summary judgment, entering judgment for them in the amount of $207,871.94.[2] Partial summary judgment was also entered in favor of Resnick for $29,861.56.[3] All other matters were ordered to be the subject of further proceedings. The court made a determination pursuant to Maryland Rule 605 that there

---

1. Four other related cases are pending: *Kaplan, et al. v. Resnick* in the Superior Court of Baltimore City, Docket 1975, Folio 1289, File No. 6741 in which the appellees seek compensatory and punitive damages for breach of the partnership agreement, breach of fiduciary duty, interference with contracts, and conversion; *Kaplan, et al. v. Resnick* in the Superior Court of Baltimore City Docket 1975, Folio 200, File No. 4150 in which the appellees seek recovery of contingent legal fees; *Resnick v. Kaplan, et al.* in the Baltimore City Court, Docket 110, Folio 661, File No. 21 in which appellant seeks damages for breach of contract by causing Resnick to be removed from the partnership and interfering with Resnick's relationship with his clients; and *Resnick v. Kaplan, et al.* in the Circuit Court for Baltimore City, Docket 1975, Folio A-597, File No. 55242 seeking an accounting.

2. Appellees' brief discloses that, because of an error in the calculation of the dollar amount of an additional one-half per cent partnership interest claimed by appellant, the judgment in their favor should be reduced to $200,728.04.

3. Appellant Resnick had not filed a cross-motion for summary judgment. The lower court's action was in accordance with Maryland Rule 610 d.1.

was no just reason for delay and that the partial summary judgments were immediately appealable.

The primary dispute thus resolved by the lower court was the method of allocation of fees received by the parties after dissolution; and it was decided that the allocation should be made on the basis of their respective percentage interests in the partnership, not on the basis of the time spent on individual cases after dissolution. Resnick contends that summary judgment was improper. We affirm.

## I

Early on,[4] the parties worked together as employees of Sol C. Berenholtz, Esq. in the practice of law in Baltimore. (Resnick is a son-in-law of Berenholtz.) By a written agreement dated December 31, 1968, Kaplan, Heyman, Engelman, and Resnick became his partners. The new firm, in its partnership document, agreed to employ Herbert J. Belgrad ("Belgrad") and Berenholtz's son, Carl, as associates; and provision was also made for Belgrad and Carl to be admitted later as partners. They did become partners on January 1, 1972, but Carl's partnership was short-lived; he soon left and a settlement was made with him. Sol Berenholtz ceased to be a partner on December 31, 1971, pursuant to the terms of the agreement. The partnership was dissolved on or about October 18, 1972.[5] The distribution of profits and losses provided for in the partnership agreement at the time of dissolution was as follows:

| Kaplan | 22 1/2% |
| Hayman | 22 1/2% |
| Engelman | 18 1/2% |
| Resnick | 18 1/2% |

---

4. The facts stated herein are gleaned from the supporting and opposing affidavits filed in connection with the motion for summary judgment and the numerous exhibits appended thereto.

5. Resnick does not contest the fact of dissolution but contends the correct date was October 23, 1972.

| Belgrad | 10% |
|---|---|
| Carl | 8% [6] |

The parting between the Kaplan group (Kaplan, Heyman, Engelman, and Belgrad) and Resnick was not "sweet sorrow." Appellees contend that Resnick breached his fiduciary duties to his partners, before and after the termination of the partnership, in many respects. Similar counter-charges are made by Resnick who also accuses his former colleagues of "wrongfully firing Carl Berenholtz [7] and wrongfully firing me."

At all events, it is undisputed that after October 18, 1972, Resnick continued to represent clients of the former firm in connection with approximately 150 cases for which he had been responsible prior to October 18, 1972. These consisted primarily of maritime and other personal injury claims of clients who had retained the firm on a contingent fee basis. Following dissolution, Resnick secured from many of those clients written statements that they desired him, and not someone else in the firm, to complete their cases. He settled a large percentage of these matters and received legal fees in the sum of $385,160.

The Kaplan group also, of course, represented other clients of the firm in connection with matters —

---

**6.** The partnership agreement was not formally amended, when Carl withdrew, to provide for the allocation of his share. The Kaplan group maintains that there was an oral agreement that the 8% share of Carl Berenholtz would be divided in half, 4% going to Belgrad and 4% proportionately to the other four partners. Resnick's percentage, according to Kaplan, et al. became 19.4024%. Resnick avers that such an allocation was discussed but no agreement was ever reached and that Carl's share was therefore to be divided in the same proportion as the interests of the partners. On this basis, Resnick's share would be 19.9024%, or a difference of one-half of one per cent. The partial summary judgments do not, of course, resolve this dispute but relegate it to further proceedings, the court below having adopted a suggestion of the appellees that the amount allegedly due them be recomputed according to the percentage claimed by Resnick, and that an omission from the partnership capital account of six asset items, as contended by Resnick, also be set aside for later decision. This served to reduce the amount due by Resnick and to leave in his hands for later decision a sum exceeding $40,000.

**7.** To this, appellees rejoin that a settlement with Carl, in which Resnick himself participated, was made by the firm early in 1972.

approximately 600 — in which the firm had been engaged prior to October 18, 1972. For legal services rendered in these cases, both before and after dissolution, Kaplan et al. collected fees of $842,962.00. The combined total of the fees collected by both sides is $1,228,122.00. No part of the sum collected by the Kaplan group has been paid to Resnick, nor has he paid to the group any part of the sum collected by him.

In a separate category, held in an escrow account, are fees paid to the firm in the settlement of so-called "African Star" cases — seamen's death cases in which the partnership had been retained several years prior to dissolution. Resnick also participated in these cases, securing execution of releases and local court approval of settlements negotiated by Philadelphia counsel. Fees aggregating $94,364.00 in these contingent fee cases were deposited in an interest-bearing escrow account, and the balance at the time of the order appealed from was $149,500. In awarding partial summary judgment, the court allocated $119,890.94 of the escrow funds to Kaplan et al. and $28,861.56 to Resnick, and ordered that the latter's claimed additional one-half per cent interest (of $149,500 or $747.50) "be maintained by the parties in a joint escrow account, pending further proceedings herein."[8]

Thus, the trial court held that distribution of the fees collected should be made among the partners in the same percentages applicable under the agreement in determining their respective distributive share in the partnership earnings.[9] Appellant vigorously challenged below, as he does here, the rule adopted by the court.

Resnick not only disagreed with the rule, but he also claimed that appellees were estopped to assert it. The Kaplan group, he argues, continually represented in its

---

**8.** A similar provision was made in the Order with respect to any funds in the escrow account at the time of distribution in excess of $149,500.

**9.** Assets of the firm distributable among the partners would include (a) the capital account of each partner and (b) each partner's undistributed share of the partnership earnings from January 1, 1972 to October 18, 1972, the date of dissolution. According to the Kaplan group, the figures for Resnick were (a) $12,273.39 and (b) $23,302.90. These figures are disputed by Resnick and are among the matters reserved for later determination.

dealings with him from the time of dissolution in October, 1972 until the filing of its summary judgment motion in November, 1979 — more than seven years later [10] — that "fees from clients of the former partnership were to be allocated on the basis of work done, respectively, by him and his former partners before and after October 18, 1972."

Furthermore, he asserts that the case is replete with genuine issues of material fact, such as to preclude summary judgment. Those disputes, according to appellant, included:

1. The date of dissolution;
2. The wrongfulness *vel non* of the conduct causing the dissolution and the designation of the responsible party;
3. Whether Kaplan et al. withheld the billing of $300,000 to $400,000 to deprive Resnick of his share;
4. The existence and appropriate valuation of former partnership assets;
5. The value of Resnick's capital account;
6. Whether he was wrongfully ousted from the firm and the effect thereof;
7. Whether the preconceived scheme and design of the Kaplan group in the formation of the partnership was to acquire the practice of Sol Berenholtz for themselves and to displace Resnick and Carl Berenholtz;
8. Whether clients of the former firm discharged the Kaplan group and engaged Resnick;
9. Whether either of the parties violated the terms of the partnership agreement and the effect thereof;
10. Whether the Kaplan group by its course of dealing from 1972 to 1979 "is bound by the

---

10. Appellees' Bill of Complaint for an accounting was not filed until October 17, 1975. Appellant filed a motion raising preliminary objection on November 18, 1975 but no answer was filed until May 2, 1977.

basis for allocation of fees which it advanced continually during that period and on which Resnick relied in performing the work for former clients . . . *viz.* that fees representing work done prior to dissolution were to be shared according to the partnership percentages . . . while fees for work done after dissolution were to be allocated to the party doing the work. . . ."

## II

The partnership agreement in this case does not provide for the rights of the parties upon dissolution. It recites that the partnership "shall commence on January 1, 1969, and continue from year to year thereafter until it is dissolved in accordance with the terms hereof." Then, it simply states:

"To the extent that dissolution is not covered by the terms of this Agreement, it shall be in accordance with the laws of the State of Maryland."

The Uniform Partnership Act, Md. Code, Corp. & Ass'ns. Art., § 9-101 (e), defines dissolution as

"the change in the relation of the partners caused by any partner ceasing to be associated *in the carrying on as distinguished from the winding up of the business.*" (Emphasis added.)

The statute also provides that the partnership is *not* terminated on dissolution *"but continues until the winding up of partnership affairs is completed."* (§ 9-601). (Emphasis added.)

Causes of dissolution are spelled out in § 9-602 and include those without violation of the agreement (§ 9-602 (1) (i)-(iv)) and those in contravention of it. (§ 9-602 (2)). Without violation of the agreement, dissolution is caused (i) by the termination of the prescribed term or undertaking, (ii) by the express will of any partner when no definite term or undertaking is specified, (iii) by the express will of all the

partners who have not assigned their interests or permitted them to be charged for their separate debts, either before or after the termination of any specified term or undertaking, and (iv) by the expulsion of any partner from the business, "bona fide in accordance with such a power conferred by the agreement. . . ." [11]

In contravention of the agreement, dissolution may occur "where the circumstances do not permit a dissolution under any other provision of this section, *by the express will of any partner at any time.*" (§ 9-602 (2)).[12] (Emphasis added.)

The rights of partners as to application of partnership property upon dissolution are governed by § 9-609 of the Act which also follows the dichotomy of dissolution in contravention of the partnership agreement and dissolution which is not. Where it is not in contravention of the agreement, each partner may have the partnership property applied to discharge its liabilities and the surplus applied to pay in cash the net amount owing each partner. On the other hand, when dissolution is caused in contravention of the agreement, each partner who has not caused dissolution wrongfully is entitled not only to his net share of the surplus after liabilities, but also to damages for breach of the agreement against each partner who has caused the dissolution wrongfully. (§ 9-609 (b) (1) (ii)). At the same time, a partner who caused the dissolution wrongfully is entitled to be paid in cash the net amount owing to the respective partners subject, of course, to his liability for damages for breach of contract. *See Laddon v. Whittlesey,* 44 Md. App. 19, 408 A.2d 93 (1979).

In the instant appeal, therefore, after the dissolution of the partnership in October, 1972, it was not terminated but

---

**11.** Paragraph 12 of the partnership agreement in this case provides that "expulsion may be only made by unanimous vote of all the partners, other than the partner affected."

**12.** Other categories of causes of dissolution are specified in § 9-602 (3) — 9-602 (6). They are: any event which makes it unlawful for the business of the partnership to be carried on (§ 9-602 (3)), the death of any partner (§ 9-602 (4)), the bankruptcy of any partner or the partnership (§ 9-602 (5)), and decree of court on application by or for a partner under § 9-603 (§ 9-602 (6)).

continued until the winding up of its affairs was complete; and whether the dissolution was in accordance with the partnership agreement or in contravention of it, and whether one side or the other caused the dissolution wrongfully, was not relevant or material to the rights of both sides to an accounting.

Resnick participated in the winding up of the partnership affairs pertaining to the 150 cases upon which he worked. Kaplan et al. handled the remaining cases of the firm. These were contractual, professional obligations and it was the duty of the respective partners to see to their completion. *See Geo. Bert Cropper, Inc. v. Wisterco Investments, Inc.,* 284 Md. 601, 399 A.2d 585 (1979). In the performance of these contracts, the fiduciary character of their relationship as partners continued. Code, § 9-404; *Herring v. Offutt,* 266 Md. 593, 295 A.2d 876 (1972).

The Uniform Act conferred no right upon either side to compensation for services rendered in this winding up process, *cf.* § 9-401 (6) and, in the absence of any provision in the partnership document, it was correctly held that the aggregate of the fees collected should be allocated according to the percentages specified in the agreement for the distribution of profits and losses.

Directly on point is the case of *Frates v. Nichols,* 167 So.2d 77 (Fla.3d DCA 1964). Following the dissolution of a law firm, one of the partners, Frates, took with him ten negligence cases of the old firm, having secured retainer agreements from the clients. The completion of the work on these cases resulted in the payment of contingent fees in excess of $200,000. Frates contended that upon dissolution the firm's retainer agreements expired and that, on the basis of the new retainers which he had obtained, he was entitled to retain all the fees except a *quantum meruit* payment to the old firm for services rendered prior to the dissolution. The court rejected this contention, concluding that these fees in their entirety were assets of the firm and that Frates was entitled to receive only his partnership interest therein. In reaching this conclusion, the court stated:

"Although never having been passed on by a Florida court, the proposition is universally accepted that a law partner in dissolution owes a duty to his old firm to wind up the old firm's pending business, and that he is not entitled to any extra compensation therefor.

"The dissolution date of February 28, 1961 did not put an immediate end to the partnership, it continued for the purpose of winding up its affairs, and inasmuch as Frates had a duty to wind up the affairs of the partnership, *his signing of a retainer agreement with an already existing client was without consideration and void.*

\* \* \*

"We adopt the rule recognized by our sister states that *the retention of a law firm obligates every member thereof to fulfilling that contract, and that upon a dissolution any of the partners is obligated to complete that obligation without extra compensation."* (Footnotes omitted.) (Emphasis added.)

*Id.* at 80-81. *See also Welsh v. Carroll,* 378 So.2d 1255 (Fla.3d DCA 1979); *Kreutzer v. Wallace,* 342 So.2d 981 (Fla.3d DCA 1977).

A similar result was reached in *Platt v. Henderson,* 361 P.2d 73 (Or. 1961), a case involving the dissolution of a two-member law firm. There, the defendant took with him approximately forty cases constituting the major pending business of the firm and did so without the plaintiff's knowledge or consent. None of the clients objected to the fact that the defendant had removed their files to his new office because of the dissolution of the old partnership. The court concluded nonetheless that the cases were received in winding up the business of the old partnership and that the partnership agreement with respect to the allocation of profit and loss was applicable. "[T]he defendant is not entitled to special compensation for any part of the services which he performed in the wind up." *Id.* at 85.

Appellant in this case seizes upon language of the court in *Platt* (361 P.2d at p.85), which recognized that a client has the right to elect the attorney he prefers, "and that a member of a firm cannot force himself upon a client of the firm merely because he is a member of that partnership." The proposition asserted by the court is sound; but it does not mean, as appellant contends, that the fees thereafter earned by the partner chosen by the client are not subject to division in accordance with the partnership agreement. Nor does it mean that the fiduciary duty imposed upon partners to render a faithful accounting to the partnership for fees earned is diminished in the slightest.

Finally, we reject the notion, suggested by appellant, that different rules are to be applied to the winding up of professional partnerships as distinguished from "business" partnerships. The definition of "business" in the Act as including "profession," § 9-101 (c), negates the possibility of any such distinction.

### III

The court below rejected — correctly, we think — what it referred to as the "estoppel argument." Briefly, the circumstances giving rise to the argument were these: each side of this controversy was represented by independent counsel prior to dissolution in October, 1972, or immediately thereafter. On November 28, 1972, counsel for the appellees, Benjamin R. Civiletti, Esq., addressed a letter to Benjamin Lipsitz, Esq., counsel for the appellant, in reply to one received from the latter on November 20, 1972.

In the course of his five-page communication, Mr. Civiletti stated, ". . . I believe it may be helpful to set out as clearly as I can our clients' positions with regard to the law," and he undertook to outline Mr. Resnick's rights and corresponding duties. His rights, with respect to clients of the firm, were defined as follows:

"He has a right to obtain the file of any client who has decided to terminate the firm's representation

and to engage him to represent him provided (a) he agrees either to pay or to allow the firm to credit against amounts owed to him prior advances or disbursements on behalf of such client and (b) he agrees to pay the firm that portion of fees earned by the firm prior to October 18, 1972 out of any fees collected after October 18, 1972, *the allocation to be on a time basis.* Such fees should be escrowed until the allocation is agreed upon." [13] (Emphasis added.)

In the ensuing years, particularly during discovery proceedings after suit was filed in 1975, extensive data was obtained with respect to Resnick's 150 case files and the files of the Kaplan group, disclosing fees earned and time spent both before and after dissolution. Appellant argued below and in his principal brief [14] on appeal, that

"Resnick's affidavits patently present facts from which one could reasonably conclude that the Kaplan group caused and permitted him to proceed with post-dissolution work on the premise that his efforts would be compensated in proportion to time spent and work done. Resnick might otherwise have deferred to the Kaplan group to do the work, since he could just as well have devoted himself to his own affairs, since he would receive his percentage partnership interest anyhow, according to the Kaplan group's approach."

---

**13.** In an earlier letter dated November 14, 1972, Mr. Civiletti forwarded to Mr. Lipsitz an agreement regarding the release of client files which had been discussed in a telephone conversation on November 13, 1972. Mr. Civiletti explained that under the proposed agreement "Murray [Resnick] agrees to be responsible for fees due for work done prior to the transfer of the file to Murray and specifies *where he thereafter does legal work and therefore the fees would have to be split, the basis for the split would be the amount of work done by each party respectively."* (Emphasis added.)

**14.** In a reply brief, Resnick asserts that "[b]y its actions over a period of years, the Kaplan group consented, or agreed, at least by clear implication, to division of fees on 'pre' and 'post' dissolution and time and work basis." He thus appears to argue, for the first time, the existence of an agreement with respect to allocation of fees. This comes too late. Maryland Rule 1085. At all events the argument is passing strange in a situation where disagreement is rampant, extending even to the date when dissolution occurred.

Rejecting the theory of estoppel, the trial court ruled:

"I see no merit to the estoppel argument. I think that the representations in the various pieces of correspondence between counsel as well as between the parties with regard to expressions of what the controlling law was are just that, expressions of opinion, and for the reasons already argued I don't believe that estoppel applies to positions taken on expressions of legal principles. The other important thing I believe which makes the estoppel argument ineffective here is the fact all of these assertions were made as a continuing effort to settle these cases, so there was a certain amount of give and take on both sides, . . . ."

An extensive discussion of the law of estoppel is contained in the opinion of Chief Judge Brune in *Bayshore Industries, Inc. v. Ziats,* 232 Md. 167, 192 A.2d 487 (1963), where the Court noted at 175, that it had "repeatedly approved" Pomeroy's definition of equitable estoppel, 3 Pomeroy's *Equity Jurisprudence* (5th ed.), § 804, p.189:

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is 'absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon which conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

*See also Zimmerman v. Summers,* 24 Md. App. 100, 330 A.2d 722 (1975).

Clearly, the conduct and circumstances here were not such as to give rise to an estoppel. It is indubitably correct to say that the litigating lawyers and their respective counsel were all initially, and for a long time, laboring under a mutual

mistake of law, albeit the pertinent facts were known by both sides. An estoppel does not arise in this context.

> "Where the knowledge of both parties is equal, an estoppel will not be held to have arisen, . . . and where the parties labor under a mutual mistake of law resulting in acts by one, such acts do not create an estoppel as a matter of law nor does misconstruction of the legal effect of all relevant facts known to both sides."

*Mayor and City Council of Baltimore v. Chesapeake Marine Railway Co.,* 233 Md. 559, 581-582, 197 A.2d 821, 832-33 (1964).

As the Second Circuit put it in *Aunt Jemima Mills Co. v. Rigney & Co.,* 247 F. 407 (1917), an expression of opinion (as in Mr. Civiletti's letter of November 28, 1972) "does not make the law other than it is. . . . [The defendants] took the risk of acting on that opinion if it were erroneous." *Id.* at 409. In that case, the plaintiff had written defendants a letter in which it was stated, in part, that plaintiff presumed that usage of a trademark would be legal. The court held that plaintiff was not estopped from changing its position and "relying on the law as it really is."

In the instant case, it must be borne in mind that appellant was an experienced lawyer, represented by an experienced lawyer. He had equal access to the law books. He began very early to contact the clients in the 150 cases and procured numerous requests that he see their matters to completion, prior to receipt by his counsel of any communication from counsel for the Kaplan group. Thus, appellant himself presumed at the outset that the percentage distribution in the partnership agreement would have no application to his post-dissolution work on the law firm's cases. However, the partnership agreement, the contract between the parties, did not so provide. Neither, as we have held, did the law of the State of Maryland. In taking cases to completion upon the dissolution of the firm, he was carrying out a responsibility that was his — legally and ethically — without entitlement to special remuneration.

## IV

The cases are legion for the proposition that summary judgment is not a substitute for a trial but a hearing to decide whether a trial is necessary. The rule permitting it, Maryland Rule 610, limits its application to situations where there is no genuine dispute as to any material fact and judgment should be entered as a matter of law. The remedy is available *"as to all or any part of the claim."* (Rule 610 (a) (1); emphasis added).

In granting partial summary judgments in this case, Judge Karwacki expressly recognized that there were claims for wrongful expulsion and other issues involved between the parties. "There is other pending litigation," the court stated, "in the Courts of the Supreme Bench of Baltimore City which will give a forum for these complaints to be aired."

We observe that, in addition to wrongful expulsion, appellant's affidavits in this case assert claims for breach of contract, breach of fiduciary duty and tortious conduct. No counterclaim was filed in this case, and appellant's grievances are being pursued in *Resnick v. Kaplan, et al.* in the Baltimore City Court and the Circuit Court for Baltimore City. See note 1, *supra.*

A narrow issue was decided in the proceedings from which this appeal arises — the entitlement *vel non* of the appellees to partial judgments on a legal theory of fee allocation which they advanced and which the court adopted. The amounts awarded — to each side — were undisputed. Any matters in dispute, including the appellant's claim to a miniscule half of one per cent increase in his partnership share, were expressly reserved for further proceedings; and the figures were computed as if his assertions were correct. Kaplan et al. requested the court to render partial summary judgment only with respect to claims as to which there was no material factual dispute. The court followed that course.

We deem it appropriate to note that the award of partial summary judgments avoided a protracted trial, involving some 750 case files, with testimony *ad nauseam* concerning

the amount of work performed on each file before and after October 18, 1972, and the dollar value of that work. A decision at that point that the Kaplan group's theory of distribution applied would only have lent support to Dickens' oft-quoted characterization of the law.

We reject appellant's contention that there were genuine disputes as to material facts.

## V

We also find without merit appellant's contention that the court below erroneously denied his motion raising preliminary objection based on the pendency of an action at law between the same parties. The essential requirement that the "whole effect of the second suit should be obtainable in the first" does not exist in the case. 3 *Poe's Pleading and Practice* (6th ed.), § 75F; *see Coppage v. Orlove,* 262 Md. 665, 278 A.2d 587 (1971).

> *Order modified by reduction of judgment for Kaplan et al. from $207,871.94 to $200,728.04 and as modified, affirmed; costs to be paid by appellant.*