**In the Matter of Gary M. CUPPLES, Respondent.**

No. 79063.

Supreme Court of Missouri, En Banc.

Aug. 19, 1997.

John E. Howe, Chief Disciplinary Counsel, Sam Phillips, Staff Counsel, Jefferson City, for informant.

Gary M. Cupples, Kansas City, for respondent.

ORIGINAL DISCIPLINARY PROCEEDING

PRICE, Judge.

This is an original disciplinary proceeding instituted by the Bar Committee for the 16th Judicial Circuit. Gary M. Cupples was charged by the Chief Disciplinary Counsel with two counts of violating *Rule 4–8.4(c)*. We find that Cupples engaged in misconduct by secreting client litigation files from his partners in preparation to withdraw from the law firm and by removing client litigation files from the firm without the appropriate consent of the client. We order that Cupples be publicly reprimanded for this misconduct.

## I.

### A.

In a disciplinary proceeding the Master's findings, conclusions, and recommendations are advisory in nature. *In re Oberhellmann*, 873 S.W.2d 851, 852 (Mo. banc 1994). This Court reviews the evidence de novo, determines independently the credibility, weight, and value of the testimony of the witnesses, and draws its own conclusions of law. *Id.* In attorney disciplinary proceedings, the truth of allegations must be established by a preponderance of the evidence. *In re Howard*, 912 S.W.2d 61, 63 (Mo. banc 1995).

### B.

We find the following facts. Gary Cupples has been an attorney licensed to practice law in the State of Missouri since 1978. After graduation from law school in 1978, Cupples was hired as an associate with the firm of Deacy & Deacy. He was made a partner of the firm in 1985. During his tenure with Deacy & Deacy, Cupples handled a significant amount of litigation for the State Farm Insurance Company. State Farm was one of the Deacy law firm's biggest and oldest clients. State Farm had authorized a limited number of law firms in the Kansas City area to represent it and its insureds. Cupples acknowledged that he knew that the firm was authorized to handle State Farm business, but that he, as an individual lawyer, was not.

Deacy & Deacy had a policy of assigning State Farm cases within the firm on an alphabetical basis, regardless of to whom the case was initially addressed. During the relevant time, Cupples was assigned all State Farm cases beginning with the letters "B" and "I". Under the alphabetical system, if a case that began with the letter "B" or "I" was addressed to a member of the firm other than Cupples, that attorney would enter the case in the firm's "day book", fill out a File Receipt Form, and turn the file over to Cupples. If Cupples received a file for a case that did not begin with the letters "B" or "I", he was supposed to enter the case into the daybook, fill out the File Receipt Form, and turn the file over to the proper member of the firm. The firm's policy allowed cases to be assigned outside of the alphabetical system when State Farm requested that a particular attorney work on the file or when an attorney was too busy with other files to work on a case that normally would be assigned to him. State Farm knew of Deacy & Deacy's case assignment system and regional superintendents from State Farm met regularly with Deacy & Deacy to discuss its representation of State Farm.

During the Memorial Day weekend of May 31, 1993, one of the members of Deacy & Deacy learned that Cupples had leased office space to establish his own independent law practice. Upon being informed of that news, Thomas Deacy, Jr., and Spencer Brown, the managing partners of Deacy & Deacy, called directory assistance and found a phone number listed as "Gary Cupples, Attorney at Law". When they called the phone number, a voice answered the phone, "Gary Cupples' Law Office."

Brown and Deacy asked Cupples to meet with them immediately after the weekend. When questioned whether he had set up an independent law office, Cupples acknowledged that he had leased office space but denied having used the office to practice law. Cupples told Brown and Deacy that he leased the space for his wife's catering business. Cupples later testified that he negotiated the lease for the office space in March 1993 and had phone service connected a few weeks prior to the Memorial Day weekend. The meeting concluded with Deacy, Brown, and Cupples agreeing that Cupples should withdraw from the firm effective May 31, 1993.

Over the next few days, the members of Deacy & Deacy learned that Cupples had failed to register twelve to fifteen case files in the firm's tracking and billing systems and had failed to turn over State Farm cases that he had received but that would not have been assigned to him by the alphabetical system. Cupples also failed to report his work on these cases during weekly meetings with the members of the firm. The firm learned of this behavior when an adverse attorney left a message for Cupples, after he had left the firm, advising Cupples that his client would not agree to set aside a default judgment. Although Cupples ultimately had the default judgment set aside, the news of the judgment caused the Deacy firm to investigate the files that Cupples had worked on. By comparing computer files of correspondence that Cupples wrote to clients with the firm's list of cases, the firm learned of the twelve to fifteen files that Cupples never entered into the system.

Brown asked Cupples to meet him again on the following Saturday. During their meeting, Brown, armed with a list of fourteen or fifteen cases, questioned Cupples whether he had worked on any cases that were not recorded in the Deacy firm's system. Cupples answered that there were two

or three cases on which he had worked that were not on the firm's books. After a denial by Cupples that other cases existed, Brown told Cupples that he hoped to have the problem resolved by Monday morning.

Cupples called Brown at home the next day and admitted to possessing twelve or thirteen files. Cupples told Brown that he planned to keep the files and split the fees with Deacy & Deacy. Brown again told Cupples that he hoped to have the problem solved before a members' meeting at 9:00 a.m. on Monday morning. On Monday morning, before the meeting, Cupples called Brown and agreed to return the twelve files to the firm. Cupples asked Brown to pick the files up at his new law office at 5:00 p.m. that evening, and Brown agreed to do so. When Brown asked whether Cupples possessed any other files that belonged to the firm, Cupples evaded the question. A week later, the firm received six more files from State Farm that had been returned by Cupples when State Farm informed him that Deacy & Deacy would continue to represent it. Cupples never informed State Farm that he was not using the firm's system of handling cases or that he was hiding the files from the other members of the firm.

Cupples admitted that he previously complied with the firm's system of managing State Farm cases. He stated that he did not comply with the system in regard to the cases at issue here because he did not want Thomas Deacy interfering with the handling of the files. The obvious inference from these facts is that Cupples was planning to withdraw as a partner from the Deacy firm and that he was secreting the files in an effort to take them with him to his new practice.

### C.

On July 23, 1993, Deacy & Deacy filed a complaint relating to Cupples' behavior with the Circuit Bar Committee for the 16th Judicial Circuit. The Bar Committee held hearings on December 8 and 18, 1993. The Circuit Bar Committee found probable cause to believe that Cupples was guilty of profession-al misconduct and served a Proposed Information on March 29, 1995. Pursuant to *Rule 5.10* (then in effect), Cupples requested a hearing by the Advisory Committee to review the Bar Committee's finding. The Advisory Committee held a hearing on May 21, 1996, and ruled on May 23 that probable cause existed to believe that Cupples was guilty of professional misconduct.

An Information charging two counts of professional misconduct for violating *Rule 4-8.4(c)*[1] was filed with this Court by the chief disciplinary counsel. The Information charged:

Gary M. Cupples ... violated the following Rules of Professional Conduct (Missouri Supreme Court Rule 4):

#### Count I

Rule 8.4(c) of the Rules of Professional Conduct in that he secreted legal matters from his partners at the Deacy and Deacy Law Firm while a partner in the firm by: (a) failing to enter files received from firm clients into the firm's filing and docketing systems; and (b) failing to bill time he expended on such matters against the files at the time it was expended. Further, he removed the files on such matters from the Firm without the knowledge or consent of his partners. All such conduct was for the purpose of deceiving and defrauding his partners with the intent to appropriate the business for himself.

#### Count II

Rule 8.4 (c) of the Rules of Professional Conduct in that he engaged in conduct which involved deceit and misrepresentation to clients by (a) failing to enter files received from clients of the Deacy and Deacy Law Firm into the Firm's filing and docketing systems and failing to bill time he expended on such matters against the files at the time it was expended while a partner of the firm; and (b) removing the files on such matters from the Deacy and Deacy Law Firm following his withdrawal

---

**1.** *Rule 4-8.4(c)* provides:
 "It is professional misconduct for a lawyer to:

 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

from the Firm without the knowledge or consent of the clients.

This Court appointed Judge Donald Barnes as Master. After the Master's hearing on December 13, 1996, the Master concluded that Cupples was guilty as charged and recommended that Cupples' license be "suspended indefinitely unless the Court decides to disbar him."

## II.

Cupples raises five points in his brief challenging the jurisdiction of this Court to hear this disciplinary proceeding and alleging a violation of his due process rights.

### A.

#### 1.

■ Cupples first cites *Rule 5.13* for the proposition that "[t]he record of the investigation conducted prior to the request for the hearing shall not be made a part of the record unless the respondent is given an opportunity at the hearing to cross-examine all witnesses whose evidence is offered at the hearing." Cupples asserts that the testimony of Edward Mullen, a partner, taken during the investigation by the Circuit Bar Committee, was made part of the record without him being given an opportunity to cross-examine the witness during the Advisory Committee hearing. Cupples argues that the error renders the Advisory Committee's finding of probable cause void and divests this Court of jurisdiction.

*Rule 5.13*, as it was written in 1995, prohibited the admission of the record without cross-examination because the person being investigated had no right to be present during the investigation and had no right to cross-examine the witnesses during the investigation. *Rule 5.08* (then in effect). In this case, Cupples not only was given the opportunity to cross-examine Mullen during the investigation, but Cupples, in fact, did cross-examine him on every issue raised in the testimony. The obvious purpose of *Rule 5.13* was fulfilled so Cupples has no cause to complain. Furthermore, even without Mullen's testimony, there was sufficient evidence to find that Cupples was secreting files.

#### 2.

■ Cupples next alleges that the Advisory Committee's finding of probable cause was void because the chair of the committee engaged in an ex parte discussion with a complaining witness. The chair of the committee stated on the record she had a very brief discussion with the witness that did not involve the charges against Cupples. Bar Committee hearings held before an Information is filed with this Court are informal, nonadversarial proceedings held for the purpose of determining the existence of probable cause. *In re Sparrow*, 338 Mo. 203, 90 S.W.2d 401, 404 (banc 1935). An informal discussion with a witness not involving the charges at issue does not render the finding of probable cause void.

#### 3.

■ Cupples also asserts that the Information is void because it was not signed by the Advisory Committee. Cupples cites *Rule 5.14* (then in effect) as authority for the proposition that the Advisory Committee or a member of the Advisory Committee must sign and file the Information before this Court. *Rule 5.14* read as follows:

> If a majority of the committee or division thereof conducting the hearing pursuant to Rule 5.13 finds that there is probable cause to believe that the individual under investigation is guilty of professional misconduct as charged in the proposed information, it shall cause an information to be filed in this Court.... The information shall be in the form prescribed by Rule 5.09.

*Rule 5.18* (then in effect) stated: "If an information is filed in this Court, it shall be in the form provided by Rule 5.09." *Rule 5.09* provided:

> The proposed information shall be signed by the chief disciplinary counsel, the chair and secretary of the circuit bar committee, by a majority of the members of the committee, or *the presiding officer or a majority of the members of the division of the committee to which the matter was assigned.*

(emphasis added). The Information charging Cupples was properly signed by the chair of Division 1 of the Sixteenth Circuit Bar Committee. Cupples' assertion of error simply is incorrect. Even if the Information was not signed, Cupples has fully participated in these proceedings and has not shown any lack of notice of the charges against him.

### 4.

Cupples claims that Judge Barnes failed to swear and subscribe the oath of master as required by *Rule 68.03*. Again, he is factually incorrect. The record clearly shows that Judge Barnes swore and subscribed the oath on July 23, 1996. This Court acknowledged receipt of the oath in a letter from the clerk of this Court dated July 24, 1996.

### 5.

■ Cupples asserts that the Master improperly failed to take and record the evidence in full as required by *Rule 68.03* and *Rule 73.01*. *Rule 68.03(d)* (then in effect) read:

> The master may rule upon the admissibility of evidence unless otherwise directed by the order of reference and has the authority to put witnesses on oath and may examine them and may call the parties to the action and examine them upon oath. When a party so requests, the master shall make a record of the evidence offered and excluded in the same manner and subject to the same limitations as provided in Rule 73.01(a) for a court sitting without a jury.

*Rule 73.01(a)(1)* (then in effect) read:

> The court shall rule upon all objections to evidence as in jury cases. Where the evidence is ruled inadmissible, the court upon request shall take and record the evidence in full, unless it clearly appears that the evidence is not admissible on any ground or that the evidence is privileged.

At the Master's hearing, Cupples attempted to introduce evidence through direct examination that Thomas Deacy allegedly was involved in criminal activity. Cupples offered the evidence as proof of his own state of mind during the time he was secreting the files. Judge Barnes ruled that the evidence was inadmissible, but accepted a number of protracted offers of proof from Cupples and included three exhibits related to the alleged improprieties in the court file.

The Master had discretion to rule on the admissibility of the proposed evidence. He correctly determined that alleged improprieties by one attorney do not give another attorney the right to act dishonestly. The evidence did not tend to prove or disprove the charged misconduct. Furthermore, the Master made a full record of the evidence for our review by allowing the extended offers of proof and by including the three related exhibits in the record before this Court. This substantially complied with the *Rule 73.01(a)(1)* requirement that the trial court "shall take and record the [inadmissible] evidence in full." The Master did not err in regard to this point.

### B.

■ Cupples' arguments above are as frivolous as a matter of law as they are as a matter of fact. This Court's inherent right to discipline attorneys has been recognized as "an inherent power" of this Court. *In re Sparrow, supra,* at 403. Mere procedural error is insufficient to divest our jurisdiction. The purpose of disciplinary proceedings is to protect the public and the profession from persons unfit to practice law. *In re Lang,* 641 S.W.2d 77, 79 (Mo. banc 1982).

> While rights of great importance to the individual, and the bar as well, are litigated in disbarment cases, and loose procedure should not be countenanced, the courts have repeatedly held that the action being in the nature of an inquiry for the protection of the courts, the public and the profession, strict rules of procedure should be relaxed to the end that the fitness of an attorney to continue in the profession should be determined on the merits rather than on less worthy grounds.

*In re Pate,* 232 Mo.App. 478, 119 S.W.2d 11, 24 (1938).

■ Mere procedural error by the Advisory Committee or the Master also is insufficient to implicate due process rights. This Court conducts the judicial component of the attorney disciplinary proceedings. *In*

*re Mills,* 539 S.W.2d 447, 450 (Mo. banc 1976). This Court is charged with determining all fact issues necessary to a decision. *In re Frick,* 694 S.W.2d 473, 474 (Mo. banc 1985). Cupples was not precluded from arguing his exceptions to the Master's report in proceedings before this Court. *Rule 68.03(g).* Nor was Cupples precluded from making any argument due to a lack of evidentiary support in the record. Cupples was given a full opportunity to brief and argue the facts and the law that he believed were pertinent to this Court's deliberations. Cupples has not established any specific prejudice resulting from the hearings below.

Absent a specific showing of actual prejudice, this Court will focus upon the merits of disciplinary proceedings, as should the attorneys participating in those cases. No legitimate jurisdictional or due process issue was presented by Cupples in raising allegations of error in the informal Advisory Committee hearing or in the hearing before the Special Master.

### III.

In point IV of his brief, Cupples alleges that the inclusion of Edward Mullen's prior testimony in the record before the Master and before this Court violated his right to due process. Cupples also claims that the testimony should be excluded from the record because it is irrelevant and immaterial to the issues before this Court.

### A.

■■■ Cupples' argument that the inclusion of Mullen's testimony violates his right to due process is misguided for two reasons. First, disciplinary proceedings are not criminal trials in which a defendant has a constitutional right to confront witnesses. *In re Mills,* supra, at 450. Cupples' only right to cross-examine witnesses arose from *Rule 5.13.* That right was fulfilled by Cupples' cross-examination of Mullen in the investigation phase of the proceedings. Second, Cupples was not prejudiced by the inclusion of the testimony in the record because the evi-

dence was cumulative to other evidence that tended to prove that Cupples secreted files from the firm and because Cupples was given ample opportunity to cross-examine Mullen.

### B.

■■■ Cupples' argument that Mullen's testimony was irrelevant and immaterial focuses primarily on testimony concerning a default judgment entered in one of Cupples' secreted files. Although Cupples was not charged with negligence for allowing the default judgment to be rendered, the testimony was demonstrative of the harm that can befall clients and partners when an attorney secretes files. The testimony was both relevant and material.

### IV.

In points V and VI of his brief, Cupples challenges the sufficiency of the evidence against him. Cupples claims that the Chief Disciplinary Counsel failed to establish by a preponderance of the evidence that he was guilty of professional misconduct.

### A.

The problems that occurred when Cupples decided to leave Deacy & Deacy are symptomatic of a growing trend in the day-to-day business of the legal profession. "Partners in law firms have become increasingly 'mobile,' feeling much freer than they formerly did and having much greater opportunity than they formerly did, to shift from one firm to another...." William H. Rehnquist, *The Legal Profession Today,* 62 IND. L.J. 151, 152 (1986). "There was a fear, there is a fear, there always will be a fear, that highly productive partners ... can leave, go to another place and get more money." Allan W. Vestal, *"Assume a Rather Large Boat ...": The Mess We Have Made of Partnership Law,* 54 WASH. & LEE L. REV. 487, 487 (1997) (quoting John Fritts, Esq., Co–Chair, Management Committee, Cadwalader, Wickersham & Taft). This trend is giving rise to an increased number of disputes between the exiting attorneys and their former firms.[2] A

---

**2.** *See, e.g., Howard v. Babcock,* 6 Cal.4th 409, 25 Cal.Rptr.2d 80, 863 P.2d 150 (1993) (action for

accounting, damages, and declaration of rights by departing partner); *In re Smith,* 315 Or. 260,

central issue in most of these disputes is who has the right to the clients' files and who has the right to continue representing the clients.

## B.

### 1.

The client has the right to choose the attorney or attorneys who will represent it. *Rule 4–1.16(a)(3) (1997); see also Model Code*, DR 2–110(B)(4). "[C]lients are not the 'possession' of anyone, but, to the contrary, control who represent them." *Kelly v. Smith*, 611 N.E.2d 118, 122 (Ind.1993). "Clients are not merchandise. They cannot be bought, sold, or traded. The attorney-client relationship is personal and confidential, and the client's choice of attorneys in civil cases is near absolute." *Koehler v. Wales*, 16 Wash.App. 304, 556 P.2d 233, 236 (1976); *see also Ellerby v. Spiezer*, 138 Ill. App.3d 77, 92 Ill.Dec. 602, 605, 485 N.E.2d 413, 416 (1985); *Resnick v. Kaplan*, 49 Md. App. 499, 434 A.2d 582, 588 (1981); *Corti*, supra; HENRY S. DRINKER, LEGAL ETHICS 211 (1953); HILLMAN, *supra*, sec. 2.3.1.1; HAZARD & HODES, *supra*, sec. 7.3:202, at 885. The client's files belong to the client, not to the attorney representing the client. The client may direct an attorney or firm to transmit the file to newly retained counsel. *In re Grand Jury Proceedings*, 727 F.2d 941, 944 (10th Cir.), *cert. denied*, 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984); *Rose v. State Bar of Cal.*, 49 Cal.3d 646, 262 Cal.Rptr. 702,

706, 779 P.2d 761, 765 (1989); HILLMAN, *supra*, sec. 2.3.2.1. Finally, an attorney representing a client has a duty to communicate with the client regarding the client's representation. *Rule 4–1.4(b)(1997); see also Model Code*, EC 9–2. This duty includes communicating with the client about material changes in who represents the client. *See Rule 4–1.16(d) (1997); Rule 4* (Preamble); *Vollgraff v. Block*, 117 Misc.2d 489, 458 N.Y.S.2d 437, 440 (1982); Judy R. May, *Comment: In Search of Greener Pastures: Do Solicitation Rules and Other Ethical Restrictions Governing Departing Partners Really Make Sense Today?*, 40 VILL. L. REV. 1517, 1528 (1995).

### 2.

It is clear in the present case that State Farm initially had chosen the Deacy firm, in its entirety, to represent it in matters forwarded to the firm's attorneys. The firm, not the individual lawyers in the firm, maintained the authorization of the client to handle matters in the Kansas City area. State Farm also was aware of, and apparently agreed to, the alphabetical method of assigning cases to individual lawyers at the Deacy firm. It is equally clear, however, that Cupples had played a material role with regard to certain State Farm files. The record even reflects that certain lower level State Farm claims personnel would have chosen Cupples to continue handling some of his

---

843 P.2d 449 (1992) (disciplining attorney for secreting files in attempt to take clients upon withdrawal from firm); *Sonkin & Melena Co. v. Zaransky*, 83 Ohio App.3d 169, 614 N.E.2d 807 (1992) (quantum meruit action by former firm for recovery of contingency fee on files taken by departing associate); *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 246 Kan. 450, 790 P.2d 404 (1990) (former partner suing for wrongful discharge and fraud); *Jacob v. Norris, McLaughlin & Marcus*, 128 N.J. 10, 607 A.2d 142 (1992) (former partner suing for compensation due under service termination agreement); *Williams & Montgomery, Ltd. v. Stellato*, 195 Ill.App.3d 544, 142 Ill.Dec. 359, 552 N.E.2d 1100 (1990) (suit to enjoin former partners from soliciting clients of the firm); *see also* ROBERT W. HILLMAN, HILLMAN ON LAWYER MOBILITY, secs. 2.1–2.3 (1997) (discussing litigation arising from law firm break-ups); 2 GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING, sec. 7.3:202, at 885–86 (2d ed.1997) (noting that issues of client solicitation

upon the withdrawal of an attorney arise frequently in practice today); CHARLES W. WOLFRAM, MODERN LEGAL ETHICS, sec 16.2, at 887 (1986) (noting that when firm break-ups are not adequately provided for in partnership agreements, unprofessional disputes and litigation ensues); Vincent R. Johnson, *Solicitation of Law Firm Clients by Departing Partners and Associates: Tort, Fiduciary, and Disciplinary Liability*, 50 U. PITT. L. REV. 1 (1988) (surveying various actions against departing partners and associates); Charles E. Cantu & Jared Woodfill, *Upon Leaving a Firm: Tell the Truth or Hide the Ball*, 39 VILL. L. REV. 773, 777 (1994) (listing numerous examples of litigation precipitated by "split-offs."); *Analysis*, 5 ABA/BNA LAWYERS' MANUAL ON PROFESSIONAL CONDUCT 107, 108 (Apr. 12, 1989) ("The firms are using other ethics rules, as well as agency, partnership, and tort laws, in an attempt to put a stop to what they view as rapacious and illegal conduct by departing lawyers.").

cases, although higher State Farm management eventually directed all the work to remain with the Deacy firm.

 In situations where an attorney withdraws from a law firm, it is the responsibility of both that attorney and the law firm to ensure that the clients for whom that attorney had provided material representation are informed of the change in the circumstances of the clients' representation. This duty requires communication with those clients—whether written, personal, or by some other means—that is professional in nature and content. The primary purpose of the communication is to assist these clients in determining whether their legal work should remain with the law firm, be transferred to the departing attorney, or be transferred elsewhere. While it is natural to expect both the firm and the departing attorney to want the clients' continued legal representation, the primary purpose of the communication is to assist the clients in their needs and not to solicit the clients' business. A failure by the attorney or the firm to fulfill this duty appropriately may justify disciplinary action.

The Supreme Court of Oregon, in *In re Smith*, considered nearly the same factual situation as exists here. In *Smith*, the withdrawing attorney secreted thirty-one client files by failing to open files for the firm's filing system. *Smith, supra*, 843 P.2d at 450–51. The attorney also misrepresented the nature of the change in representation by sending letters to clients that only reflected a change in the name and address of the firm. *Id.* at 451. The court held that "the accused's dishonesty, deceit, and misrepresentation violated a duty to his clients." *Id.* The court found that the attorney's breach of his duty to his clients harmed or potentially harmed his clients in two different ways. First, "[h]is months-long failure to set up client files could have harmed his clients: it could well have resulted in missed deadlines or lost documents." *Id.* Second, "[h]is clients also could have been harmed by the limitation upon their opportunity to decide whether to stay with the GGMS law firm, to go with the accused to his new law firm, or to make another choice." *Id.* The court suspended Smith from the practice of law for

four months for breaching his duty to his clients.

 By secreting the State Farm files from the Deacy firm prior to his withdrawal and by removing State Farm files from the Deacy firm after his withdrawal, without appropriate State Farm consent, Cupples materially altered the nature of the representation. Instead of receiving the full services of a law firm that had represented it for years, State Farm was being represented by an individual lawyer without the various systems of support that had previously assisted him. State Farm had a right to be informed of the change in the nature of the representation and of Cupples' withdrawal from the Deacy firm. State Farm had a right to determine who would continue to perform its legal work. By secreting State Farm's files and concealing the change in the nature of the representation, Cupples violated *Rule 4-8.4(c)*.

### C.

A partner in a law firm also has duties to the other partners in the firm. We acknowledge that Justice Blackmun noted, in *Bates v. State Bar of Arizona*, that "law offices are big businesses.... To term them noncommercial is sanctimonious humbug." 433 U.S. 350, 368 n. 19, 97 S.Ct. 2691, 2701 n. 19, 53 L.Ed.2d 810 (1977) (quoting counsel for appellee at oral argument). Nevertheless, the often quoted standard set out by Justice Cardozo in *Meinhard v. Salmon* still controls:

> Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.

249 N.Y. 458, 164 N.E. 545, 546 (1928).

 A partner's fiduciary duty includes the duty to be candid concerning business opportunities, the duty to be fair, the duty

not to put self-interests before the interests of the partnership, and the duty not to compete with the partnership in the business of the partnership. Johnson, *supra*, at 100. In the context of a withdrawing lawyer, these duties have been applied to lawyers who solicit clients before withdrawing from the firm, who withhold business opportunities from the partnership, and who secrete files from the firm. *See, e.g., In re Silverberg*, 81 A.D.2d 640, 438 N.Y.S.2d 143, 144 (1981) ("The solicitation of a firm's client by one partner for his own benefit, prior to any decision to dissolve the partnership, is a breach of the fiduciary obligation owed to each other and the partnership. . . ."); *Meehan v. Shaughnessy*, 404 Mass. 419, 535 N.E.2d 1255, 1265 (1989) ("[The departing lawyers] excluded their partners from effectively presenting their services as an alternative to those of [the departing attorneys]."); *In re Smith, supra*, at 452 (noting that attorney violated ethical rules implicit obligation to be candid and fair with partners by secreting files).

Although violations of a lawyer's fiduciary duty to his firm may give rise to civil liability, courts also find disciplinary liability in particular circumstances. *See, e.g., Committee on Prof. Ethics & Conduct of Iowa State Bar Assoc. v. McClintock*, 442 N.W.2d 607 (Iowa 1989); *In re Casey*, 174 Wis.2d 341, 496 N.W.2d 94 (1993); *In re Silverberg, supra; In re Smith, supra*. In *McClintock*, the court held that the respondent violated the disciplinary rules' prohibition against conduct that adversely reflects on the lawyer's fitness to practice law, *DR 1–102(A)(6)*, by failing to remit court-appointed attorneys' fees to the firm. *McClintock, supra*, at 608. The court stated, "Most law partnerships are founded upon a total trust and confidence among the partners. A breach of this exceedingly close relationship merits disciplinary action." *Id.*

In *In re Smith*, the Supreme Court of Oregon, also addressed the departing attorney's violation of his duties to his former firm as a ground for discipline. *In re Smith, supra*, at 451–52. The court found that Smith's intentional failure to input the thirty-one files "clearly was conduct involving dishonesty, fraud, deceit, or misrepresentation."

*Id.* at 451. The court stated that "[t]he surreptitious handling of the client files was dishonest and deceitful toward [his former firm]." *Id.* In assessing the potential harm caused by the attorney's breach of duties, the court wrote:

> Partners of the GGMS firm also were exposed to potential harm by the failure of the accused to let the firm know whom he was representing while he practiced there; they could have been exposed to professional liability claims for errors of the accused in matters about which they had no knowledge.

*Id.* Finally, the *Smith* court held:

> Although there is no explicit rule [disciplinary rules] requiring lawyers to be candid and fair with their partners or employers, such an obligation is implicit in the prohibition of DR 1–102(A)(3) against dishonesty, fraud, deceit, or misrepresentation. Moreover, such conduct is a violation of the duty of loyalty owed by a lawyer to his or her firm based on their contractual or agency relationship.

*Id.* at 452.

■ To the extent relevant here, the duties of lawyers practicing in a firm can be summarized as follows. Prior to withdrawal, lawyers within a firm have a duty to treat each other fairly and honestly and to put the interests of the law firm regarding firm business before their individual interests. The lawyer may not compete with the firm for business opportunities. Each lawyer has a duty to the firm to represent firm clients diligently, competently, and zealously.

■ After an attorney withdraws from a firm, the fiduciary duties no longer prohibit competition. However, the firm and the departing attorney have a duty to deal in good faith in winding up the firm business. Both the withdrawing attorney and the firm have a duty to inform firm clients of any *material* change in representation and to obtain the clients' informed direction as to how the client wishes its work to be handled. The withdrawing attorney and the firm also have a duty to orderly maintain or transfer the clients' files in accordance with the clients' directions and to withdraw from rep-

resenting those clients by whom they are discharged. Both the withdrawing attorney and the firm have a mutual duty, not only to the client, but to each other as well, to make certain that these tasks are completed in a competent and professional manner to the reasonable satisfaction of their clients. *See Withdrawal and Termination*, 129 ABA/ BNA Lawyers' Manual on Professional Conduct 91:701, 712 (Apr. 21, 1993). For matters concerning lawyer discipline, we are most concerned when the failure to fulfill these duties affects client representation and not the mere division of firm assets and liabilities.

 By secreting the State Farm files from the Deacy firm and by failing to honestly appraise the firm of the legal work he was handling for State Farm, Cupples violated his duties to the firm. The firm had developed a method to properly manage the representation of its oldest and largest client and Cupples purposefully evaded that system. His actions exposed his partners to potential malpractice liability. When caught, Cupples, at best, was not forthright about his intent to withdraw from the firm and not forthcoming with cooperation in the process of assisting State Farm in determining who they would choose to handle the matters on which he had been working. Cupples' violation of his duties to the Deacy firm directly affected and endangered the quality of representation the firm provided to State Farm.

Cupples actions in this regard was misconduct in violation of *Rule 4–8.4(c)*.

## V.

 Cupples' actions in secreting State Farm files before and after his withdrawal from the Deacy firm created potential and actual harm to State Farm and the Deacy firm. His actions violated his duties to both the client and the firm and constituted misconduct in violation of *Rule 4–8.4(c)*. In determining the sanction to be assessed against Cupples, we also consider that Cupples obtained consent from lower level State Farm claims personnel to continue representing State Farm, that Missouri has not had a written decision of law squarely addressing this matter, and that Cupples has

practiced law for nearly twenty years without previous complaint.

We order that Cupples be publicly reprimanded. Costs are assessed against him.

BENTON, C.J., and ROBERTSON and WHITE, JJ., concur.

COVINGTON, J., concurs in part and dissents in part in separate opinion filed.

LIMBAUGH and HOLSTEIN, JJ., concur in opinion of COVINGTON, J.

COVINGTON, Judge, concurring in part and dissenting in part.

I concur in all respects with sections I through IV of the principal opinion. I respectfully dissent on the issue of discipline. Respondent acted dishonestly. This Court disciplines dishonest conduct by disbarment or suspension.

The American Bar Association's Standards for Imposing Lawyer Sanctions (1986) (ABA Standards), to which this Court has generally adhered in recent years, recommend suspension in a case in which "a lawyer knowingly deceives a client, and causes injury or potential injury to the client." *ABA Standards for Imposing Lawyer Sanctions, Rule 4.62* (1986). The ABA Standards also recommend suspension when a lawyer knowingly violates a duty owed to the profession, as the respondent has done, and "causes injury or potential injury to a client, the public, or the legal system." *ABA Standards, Rule 7.2*. A failure of integrity such as the one in this case requires, in my view, a severe sanction. *See ABA Standards, Rule 1.1* ("The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged . . . their professional duties to clients, the public, the legal system, and the legal profession.")

This Court's own precedent suggests that disbarment may be appropriate. In *In re Oberhellmann*, 873 S.W.2d 851, 856 (Mo. banc 1994), this Court disbarred a lawyer from the practice of law, following ABA Standards, Rule 6.12, where the lawyer lied to a tribunal in an attempt to retain federal diversity jurisdiction by asserting that his client

resided in a state in which the client did not reside. In *In re Storment,* 873 S.W.2d 227, 231 (Mo. banc 1994), this Court disbarred a lawyer for submitting false evidence to a court. This Court, in *In re Maier,* 664 S.W.2d 1, 2 (Mo. banc 1984), disbarred a lawyer for diverting money from his law firm and clients. Finally, this Court disbarred a lawyer for defrauding another attorney in *In re Panek,* 585 S.W.2d 477, 479 (Mo. banc 1979).

Any discipline less than suspension is clearly insufficient. In *In re Disney,* 922 S.W.2d 12, 16 (Mo. banc 1996), a lawyer lied to his client to secure a loan in an attempt to hide assets from his former wife, and this Court ordered his immediate suspension. In *In re Stricker,* 808 S.W.2d 356, 361 (Mo. banc 1991), this Court, rejecting the recommendation of the Master to reprimand a lawyer, suspended the lawyer for misconduct that included dishonesty and deceit. In *In re Littleton,* 719 S.W.2d 772, 777 (Mo. banc 1986), this Court stated, "Reprimand ... is appropriate only where the attorney's breach of discipline ... does not involve dishonest, fraudulent, or deceitful conduct on the part of the attorney." In the present case, respondent lied to his partners and deceived his clients. Reprimand is unwarranted.

In accord with finding suspension to be the proper discipline is *In re Smith,* 315 Or. 260, 843 P.2d 449, 453 (1992), the case upon which the principal opinion heavily relies. In *Smith,* the Oregon Supreme Court suspended the respondent from the practice of law for a period of four months. The *Smith* case differs in almost no respect from the case presented here.

Applying the ABA Standards and considering the precedent cited, respondent should be suspended from the practice of law.

To determine an appropriate length of suspension, this Court considers the effect of mitigating and aggravating factors. *In re Howard,* 912 S.W.2d 61, 64 (Mo. banc 1995). The majority considers the fact that this Court has not previously had a written decision of law squarely addressing this matter. This, I respectfully submit, should not be considered in mitigation. The decision in this case, that respondent's conduct violates

Rule 8.4(c), should come as no surprise to anyone. The majority opinion accurately and eloquently describes respondent's misconduct and the manner in which it violates the Code of Professional Responsibility. Lawyers need neither the Code of Professional Responsibility nor this Court, however, to announce that we should refrain from conduct that is deceitful and dishonest. Nor do lawyers need disciplinary committees or courts to tell us that surreptitious handling of client files constitutes deceitful and dishonest conduct. This case is not one to which any member of the bar would be looking for an interpretation of the Code of Professional Responsibility. There is no new law announced here, nor is there any legitimate dispute with respect to the facts. Finally, as set forth above, this Court's precedent with respect to discipline of deceitful, dishonest conduct is long and well established. In summary, there are no surprises contained in the law or the facts relative to respondent's misconduct.

I might give weight to the fact that respondent has practiced law for nearly twenty years without complaint, as does the majority, but for the fact that respondent's substantial experience in the practice of law works as an aggravating, as well as mitigating, circumstance. *See ABA Standards, Rule 9.22(i).* The undisputed aggravating factor, however, is that the violation in this case was dishonest, selfish, willful, deliberate, and inexcusable. *See ABA Standards, Rule 9.22(b).* Although the length of respondent's practice without complaint evidences the personal tragedy involved, it does not overcome the clear evidence in this case, nor does it mitigate the scheming, devious methods employed by respondent and the potential harm that is so aptly described in the principal opinion. *See In re Mendell,* 693 S.W.2d 76, 78 (Mo. banc 1985). The majority's willingness to view respondent's conduct with leniency is a view I would share, but only to distinguish between disbarment and suspension.

Honesty is, perhaps, the most essential quality for a lawyer. The purpose of disciplinary action is to protect the public, the legal system, and the profession. No sanc-

tion lesser than suspension is consistent with the purpose for which our disciplinary actions exist. I would order respondent suspended from the practice of law for six months.